**Stuart Grassian, M.D.**
401 Beacon Street
Chestnut Hill, MA 02467
(617) 244-3315; fax (617) 244-2792


**Re: Keith Lowe v. Superintendent John Frame, et al.**
   **U.S. Dist Ct, So. Dist of West Virginia, Civ No: 2:25cv272**


**Psychiatric Report Regarding Keith Lowe**


I am a Board-certified psychiatrist, licensed to practice medicine in the Commonwealth of Massachusetts and was on the teaching faculty of the Harvard Medical School for over 25 years. As described in detail in the Qualifications section of this report, I have significant experience in evaluating the psychiatric effects of stringent conditions of confinement. I was retained in this litigation on May 6, 2025, during the course of an emergency petition by Mr. Lowe's attorneys after he attempted to commit suicide on April 6, 2025, while incarcerated in solitary at Mount Olive Correctional Complex. My understanding is that there will be a hearing on this petition on May 14, 2025. By the time of that hearing, I will not have had time to prepare a thorough individualized evaluation of Mr. Lowe. I am herein providing a more general report about solitary confinement and its psychiatric effects

Prior to the May 14, 2025 hearing, I have reviewed the following documents:

• Lowe v. Frame et al. First Amended Complaint.
• Keith Lowe, Recent Medical Records
• Exhibit 1: Expert Declaration of Dr. Sofia Sami, following April 2025 suicide attempt.
• Keith Lowe, Supplemental Medical Records
• Lowe Forensic Evaluations from Criminal Trial
• Three Rivers Diagnostic Evaluation of Keith Lowe.

1

I was asked to assume that the conditions of Mr. Lowe's confinement for the past almost 13 years are accurately described in the First Amended Complaint referenced above. From a review of the documents provided, it is clear that in addition to a history of severe childhood trauma and abuse, Mr. Lowe has a major psychiatric disorder that preceded his present incarceration. This disorder is most likely in the Bipolar or Schizoaffective range, a diagnostic range associated with a greatly increased risk of suicide. Prior to the homicide in 2003, he had received inpatient and outpatient psychiatric treatment and had been on antidepressants, and both mood-stabilizing and antipsychotic medications.

My *curriculum vitae* and a testimony list are separately attached to this report as Appendix A and Appendix B, respectively. I have published several articles regarding the psychiatric effects of solitary confinement although I have not published any within the past ten years. My professional fee is $600/hour, and is not dependent upon the opinions I express, nor is it dependent upon the outcome of this litigation.

1. **Qualifications Regarding Psychiatric Effects of Segregated Confinement.**

I have been actively engaged as a psychiatric clinician continually since 1974, when I began my psychiatric residency at Beth Israel Hospital – Harvard Medical School. During the course of my professional career, I have had extensive experience in evaluating inmates who were experiencing, or had in the past experienced, stringent conditions of confinement, such as conditions that have traditionally been termed as "solitary confinement". In 1983, I published an article in the American Journal of Psychiatry (AJP), titled *Psychopathological Effects of Solitary Confinement*, describing a particular psychiatric syndrome associated with solitary confinement.

The article also noted that this syndrome had been previously described in the psychiatric literature. This article is attached hereto and is incorporated herein as Exhibit C to this report.

I also published an article entitled *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. Journal of Law & Policy (2006).  This article describes the extensive body of literature, including clinical and experimental literature, regarding the effects of decreased environmental and social stimulation in a variety of medical and non-medical situations, as well as in relation to the effects of segregated confinement on prisoners. This article is likewise attached hereto and incorporated herein as Exhibit D to this report.

I have given lectures and seminars regarding these issues. They include, but are not limited to, lectures at Harvard Law School and Harvard Medical School, at meetings of the Nova Scotia, Virginia and New York State Bar Associations, the Office of Military Commissions of the U.S. Department of Defense (regarding Guantanamo detainees), the Federal Capital Defenders Habeas Unit, the John Jay College of Criminal Justice, and the American Correctional Association, as well as invited testimony before state legislative hearings in New York, Massachusetts and Maine.

I have been retained over the years as an expert in class-action investigations and lawsuits regarding these issues in a number of jurisdictions in the United States and Canada. My testimony list, Appendix C, lists several of these.

**2.  Conditions of Solitary Confinement, Generally.**

In recent years, the term "solitary confinement" has often been replaced by other terms, such as "Administrative Segregation, "Special Handling Unit', and so forth.  But whatever the term, the conditions imposed are all fairly similar.  It is my understanding from Mr. Lowe's

attorneys, as stated in the First Amended Complaint *(hereinafter – "the Complaint")* that Mr. Lowe has been housed in solitary confinement conditions for almost 13 years consecutively.

Solitary confinement is the housing of an inmate alone in a relatively small, fairly barren cell (usually about 80-100 square feet – although the Complaint states that Mr. Lowe's cell is only 60 square feet) for upwards of 22-23 hours a day, with minimal opportunity for perceptual, occupational, or social stimulation. It is a form of confinement that imposes harsh and sterile conditions, providing little stimulation or opportunity for productive engagement. It imposes perceptual deprivation,[1] forced idleness, and social isolation.

• The cell usually contains a sink and toilet (most often, a stainless steel sink and toilet combination) and a platform (either a concrete slab or a metal frame) on which is placed a relatively thin mattress. A pillow, blanket, and bedding are almost always provided, and are exchanged periodically for cleaning.

• The inmate typically cannot wear his own clothes, but instead is provided with underwear and a specific type of uniform, often of a jumpsuit variety. Clothing is periodically exchanged to be washed and cleaned.

• There is usually a window looking out onto the outside world, though in particularly harsh conditions there is no window, or the window is frosted or shuttered.

---

[1] The term "sensory deprivation" has sometimes been used to describe the perceptual deprivation associated with such conditions, but that term is actually a misnomer. What is lacking in solitary is not the absence of all stimulation, but rather the lack of meaningful, anchoring stimulation. The stimulation of, for example, steel doors banging and inmates yelling does not ameliorate the effects of environmental deprivation, nor do the brief interactions through the cell door with staff making rounds or providing meal trays. Indeed, noxious stimulation has been shown to worsen the effects of perceptual deprivation. For example, in various interrogation situations, such as that used by the British in interrogating suspected IRA members, and that used by the United States military and CIA in interrogation at Guantanamo, noxious stimulation, especially high decibel noise, was intentionally used to worsen the psychiatric effects of solitary confinement.

• The cell door is typically a solid steel door on a sliding track; the door typically contains a horizontal slot in which food may be passed and hands shackled, and a second small window facing onto the tier. The food slot is typically closed and opened with a latch outside the cell. In particularly harsh conditions of confinement, the window facing the tier may also have a cover that can be latched from outside the cell.

• A limited amount of reading material is typically allowed, as is paper, a writing instrument, envelopes, and stamps. Television and/or radio is sometimes allowed (although only a few channels might be available.) Occasionally, other personal devices (e.g., video games, i-pods, etc.) are allowed. More recently, some prisons have provided a tablet which can be used for phone calls and to, e.g., watch movies. (Broad internet access itself is not allowed.) A limited amount of personal property (e.g., photos and items of clothing such as sneakers) is usually allowed.

• Meals are eaten alone, in the cell. The inmate may or may not be allowed to purchase commissary items such as snacks.

• There is typically an hour or two a day of out of cell time for exercise alone. If outside, it is usually in a small area enclosed by concrete walls or chain link fencing. If the latter, it is often in a "dog run" cage enclosed by chain link fencing. In this situation, there are usually a set of such cages and if inmates are in adjacent cages, they can speak with each other. In particularly harsh conditions, such communication is not possible. The Complaint describes Mr. Lowe's out of cell time as being for one hour in a small cage (roughly the same area as his cell) under a walled shelter, permitting no direct sunshine, and too small for any meaningful exercise, and with no opportunity for any social engagement. It states as well that this opportunity is frequently offered late at night, in the cold and dark.

• The inmate is almost always shackled and restrained while escorted from his cell, but is almost always allowed to remain unshackled and unrestrained while in the exercise cage. The Complaint states that Mr. Lowe must accept to be strip searched whenever he leaves his cell to go to the "rec cage", and as a result, he often refuses to go.

• Social visits (family, friends) are generally permitted, but are non-contact in nature. Social phone calls are typically allowed, although they may be limited in frequency and duration.

**3. Psychiatric Effects of Solitary Confinement, Generally.**

Solitary confinement is enormously stressful psychologically. There is almost complete loneliness and helplessness. Solitary confinement undermines the individual's sense of personal agency. Where there was once self-respect, there is now depression, feelings of degradation and shame – feelings that are compounded by all of the humiliations imposed, including being required to repeatedly undergo strip search procedures.

Individuals in solitary confinement are rendered almost totally helpless. They are deprived of any sense of personal agency. "Learned helplessness," a term introduced by Dr. Martin Seligman,[2] is a much-researched concept in psychiatry that describes well the experience of individuals in prolonged solitary confinement. Research regarding this phenomenon has shown that where an individual experiences himself as powerless to choose, to affect his situation, to prevent aversive consequences, this may produce in him the loss of resilience – the loss of any will to resist negative consequences. The resulting feelings of paralysis, passivity, anxiety and depression have neurobiological correlates.[3] While incarceration itself will tend to

---

[2] Seligman, M., *Learned Helplessness*, Ann. Rev. Med. 23:407-412 (1972).
[3] *See, e.g.,* Hammack, S., et al., *Overlapping Neurobiology of Learned Helplessness and Conditioned Defeat: Implications for PTSD and Mood Disorders*, Neuropharmacology 62, 565-575 (2012); Maier, S. & Seligman, M., *Learned Helplessness at Fifty: Insights from Neuroscience*, Psych. Rev. 123(4):349-367 (2016).

6

create a pattern of learned helplessness,[4] the effects are worse when combined with the dehumanizing and humiliating experience of being confined in solitary.

Individuals in such a situation of powerlessness and deprivation are prone to becoming seriously depressed. Solitary confinement has been estimated to comprise 5% of the total prison population; it comprises 50% of all completed suicides. The harm caused by such confinement may result in prolonged or permanent psychiatric disability, including burdens that may seriously impair the inmate's capacity to reintegrate into the broader community upon release from prison.

Moreover, the deprivation of meaningful social, perceptual, and occupational stimulation in solitary confinement is enormously toxic to neuropsychological functioning. I attach hereto and incorporate herein two major articles I published on this subject.[5]

The toxicity of restricted environmental stimulation in prisons has been widely known for almost two hundred years; the literature describing it is readily available. The two articles I have attached and incorporated hereto describe that toxicity in detail. And it is not just a problem in prisons. It has in fact long been known that severe restriction of environmental and social stimulation has a profoundly deleterious effect on mental functioning: this issue has, for example, been a major concern for many groups of patients including, for example, patients in intensive care units, spinal patients immobilized by the need for prolonged traction, and patients with impairment of their sensory apparatus (such as eye-patched or hearing impaired patients). This issue has also been a very significant concern in military situations and in exploration – polar and submarine expeditions, and in preparations for space travel.

---

[4] Schill, R., & Marcus, D., *Incarceration and Learned Helplessness*, Int'l J. Offender Therapy & Comp. Criminology, 42(3):224-232 (1998).
[5] Appendix C: *Psychopathological Effects of Solitary Confinement,* (1983) Amer J. Psychiatry 140:11. 1450-54.
   Appendix D: *Psychiatric Effects of Solitary Confinement.* (2006) Wash U Jl. of Law & Policy Vol. 22. 327-383.

This literature, as well as my own observations, has demonstrated that, deprived of a sufficient level of environmental and social stimulation, individuals will soon become incapable of maintaining an adequate state of alertness and attention to the environment.  Indeed, even a few days of solitary confinement will predictably shift the electroencephalogram (EEG) pattern towards an abnormal pattern characteristic of stupor and delirium.

This fact is, indeed, not surprising.  Most individuals have at one time or another experienced, at least briefly, the effects of intense monotony and inadequate environmental stimulation.  After even a relatively brief period of time in such a situation, an individual is likely to descend into a mental torpor - a "fog" - in which alertness, attention and concentration all become impaired.  In such a state, after a time, the individual becomes increasingly incapable of processing external stimuli, and often becomes "hyperresponsive" to such stimulation; for example, a sudden noise or the flashing of a light jars the individual from his stupor, and becomes intensely unpleasant.

Over time during prolonged solitary confinement, the very absence of stimulation causes whatever stimulation *is* available to become noxious and irritating; individuals in such a stupor tend  to avoid any stimulation, and progressively withdraw into their own mental fog.  There have been multiple clinical observations, including many of my own, that this hyperresponsivity to stimulation tends to remain a burden even after release from solitary.  It is especially so in regard to social stimulation.  Even individuals who were particularly gregarious before their confinement in solitary continue to be overwhelmed by social stimulation;  they become introverted, avoidant of people.

Although it has become widely accepted that mentally ill individuals are at severe risk of psychiatric decompensation in solitary, such decompensation is not limited to those with pre-

existent mental illness. Individuals in solitary confinement, even those with no pre-existing mental illness, often become seriously depressed. There is overwhelming empirical evidence that solitary confinement causes many inmates—even those with no prior history of mental illness—to become severely depressed to the point of suicide and/or self-destructive acts. Statistical studies have shown that suicide among those in solitary confinement is seven times as common as it is among those in general population. One study analyzed medical records of 244,699 incarcerations in New York City jails and found that of 2,182 acts of self-harm, approximately 50% occurred among the 7% of inmates housed in solitary confinement.[6] Another study analyzed episodes of self-mutilation in North Carolina's prisons, revealing that nearly 50% occurred among the small proportion of inmates housed in solitary; similarly, 51% of self-mutilating behaviors in Virginia prisons occurred among inmates in solitary.[7] In Texas solitary confinement units, suicide is five times more likely than in the general prison population and self-harm is eight times more likely than it is in the community outside prison.[8]

3.  **The Increasing Recognition of the Psychiatric Toxicity of Solitary Confinement.**

There has been an enormous evolution of the understanding of the toxicity of solitary confinement over the last forty years, since 1983, when my first article describing the psychiatric effects of solitary confinement was published in the American Journal of Psychiatry. At the time, there was hardly anyone in corrections who acknowledged that solitary was psychiatrically toxic, and it was an issue largely ignored by clinical associations, in academic journals, and in

---

[6] Kaba, et.al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, Am. J. Public Health, 104(3)442-447 (2014).
[7] Craig Haney & Mona Lynch, *Regulating Prisons of the Future: The Psychological Consequences of Solitary and Supermax Confinement*, New York University Review of Law and Social Change 23, 477-570 (1997).
[8] American Civil Liberties Union of Texas, *A Solitary Failure: The Waste, Cost and Harm of Solitary Confinement in Texas* (2015): https://www.aclutx.org/sites/default/files/field_documents/SolitaryReport_2015.pdf.

9

the law.  The changes since that time have been dramatic. Whether through federal investigation, legislation, litigation, or reform from within, many jurisdictions have restricted its use or even banned its use.  Reforms via legislation, policy changes, or litigation have resulted in a major decrease in the use of solitary confinement in multiple jurisdictions in the United States, including for example,  California, Illinois, Maine, Mississippi, New Jersey, New York City, New York State, New Jersey, North Carolina, Oregon, Pennsylvania, South Carolina, Washington and Wisconsin.

There has been a growing body of research in the medical literature, as well as articles in law journals, court opinions, and position papers of medical organizations and international organizations, all reaching similar conclusions: condemning prolonged solitary confinement as psychologically toxic, cruel, ineffective and counterproductive.

In the United States, a number of national organizations have voiced criticism, including among others: The American Psychiatric Association[9], The American Academy of Child and Adolescent Psychiatry[10], The American Public Health Association[11], The National Commission on Correctional Health Care[12], and The Society of Correctional Physicians[13].  An article by David Cloud in the American Journal of Public Health[14] captures the conclusions reached by these organizations: "Nearly every scientific inquiry into the effects of solitary confinement over

---

[9] American Psychiatric Association (2012) Position Statement on Segregation of Prisoners with Mental Illness (2012).   http://www.psych.org/File%20Library/Learn/Archives/ps2012_PrisonerSegregation.pdf
[10]  American Academy of Child and Adolescent Psychiatry (2012) Solitary Confinement of Juvenile Offenders (2012) http://www.aacap.org/AACAP/Policy_Statements/2012/Solitary_Confinement_of _Juvenile_Offenders.aspx ].
[11] American Public Health Association, Solitary Confinement as a Public Health Issue, Policy No. 201310 (2013), http://www.apha.org/advocacy/policy/policysearch/default.htm?id=1462
[12] National Commission on Correctional Health Care (2016) Position Statement on Solitary Confinement. http://www.ncchc.org/solitary-confinement
[13] The Society of Correctional Physicians (2013). Position Statement. Restricted Housing of Mentally Ill Inmates. http://societyofcorrectionalphysicians.org/resources/position-statements/restricted-housing-of-mentallyill-inmates.
[14] Cloud, D. et al. (2015) Public Health and Solitary Confinement in the United States. American Journal of Public Health, 105(1): pp. 18-26.

10

the past 150 years has concluded that subjecting an individual to more than 10 days of involuntary segregation results in a distinct set of emotional, cognitive, social, and physical pathologies."[15]

The criticism from the international community has been especially strong. After substantial deliberation[16], the United Nations issued a report condemning the use of solitary confinement[17].

In recent years, a number of European nations have severely restricted the use of solitary confinement and have promulgated regulations to ensure that prisoners are treated in a humane fashion.[18]

During the last decades, a number of articles and books have been published describing the psychiatric toxicity of solitary confinement, and the dangers it poses to the inmate, the prison, and to the community at large. In recent years there has been a great deal of research in the medical literature, as well as articles in law journals, court opinions, and position papers of medical organizations and international organizations, all reaching similar conclusions,

---

[15] *Id.*

[16] See, e.g. *Istanbul Statement on the Use and Effects of Solitary Confinement* at 2, International Psychological Trauma Symposium (Dec. 7, 2009), http://solitaryconfinement.org/uploads/Istanbul_expert_statement_on_sc.pdf. The conference concluded that a direct link between solitary confinement and severe psychological harm has been "convincingly documented" in many countries since the nineteenth century.

[17] U.N. Special Rapporteur, Interim Report of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, at 8–9, U.N. Doc. A/66/268 (Aug. 5, 2011).

[18] See, e.g. Shalev, S. (2015), "Solitary confinement: the view from Europe", Canadian Journal of Human Rights, Vol. 4 No. 1, pp. 143-65.                                                                 Ahalt,C. et al. (2017) "Reducing the use and impact of solitary confinement in corrections",    Intl. Jl. of Prisoner Health, 13:1, pp41-49.                                                     Smith, P. (2006) "The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature". Crime & Justice, 34(1):441-528 http://www.Jstor.org/stable/10.1086/500626          New York Times, (Aug. 6, 2015) "What We Learned from German Prisons.",

condemning prolonged solitary confinement as psychologically toxic, cruel, ineffective and counterproductive.[19]

In summary, over the past several decades, there has been an increasing recognition that solitary confinement creates great risk of harm, including suicide, and that ultimately it is a cruel, ineffective means of punishment and of maintaining the safety of both prisoners and staff, and moreover, it represents an abandonment of the responsibility of the prison system to work towards the rehabilitation of the prisoner.

In a powerful statement, Justice Kennedy of the United States Supreme Court roundly condemned the use of solitary confinement in U.S. prisons:[20]

> The human toll wrought by extended terms of isolation long has been understood, and questioned, by writers and commentators. . . .
>
> One hundred and twenty-five years ago, the Court recognized that, even for prisoners sentenced to death, solitary confinement bears "a further terror and peculiar mark of infamy." *In re Medley*, 134 US 160, 170 (1890); *see also id.* at 168 ("A considerable number of the prisoners fell, after even a short [solitary]

---

[19] *For a comprehensive study reported to the U.S. Congress,* see: Gibbons, John, and Katzenbach, Nicholas. Confronting Confinement: A Report of the Commission on Safety and Abuse in America's Prisons. New York: Vera Institute of Justice (2006),
http://www.vera.org/sites/default/files/resources/downloads/Confronting_Confinement.pdf .
   Sharon Shalev published a major compilation of work in this area:  Shalev, S. (2008) <u>A Sourcebook on Solitary Confinement.</u> https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2177494
   *See also:*  Shalev,S. (2009). <u>Supermax: Controlling Risk through solitary confinement.</u> Willan Publishing, Portland, Oregon.
   *Book length works by psychiatric clinicians have been published,* e.g.:
   Toch, H. Ph.D., (1992)  <u>Mosaic of Despair: Human Breakdowns in Prison.</u> American Psychological Association, Washington, D.C.
   Kupers,T, M.D.  (2017). <u>Solitary. The Inside Story of Supermax Isolation and How We Can Abolish It.</u> University of California Press, Oakland, California.
    *Other significant articles include:*
   Haney C. (2003) Mental health issues in long-term solitary confinement and "supermax" confinement. Crime Delinq. 49(1):124-156.
   Lovell,D.  (2008) Patterns of disturbed behavior in a supermax prison. Crim. Justice Behav. 35(8): 985-1004.
   Metzner,J, Fellner,J. (2010)  Solitary confinement and mental illness in U.S. prisons: A challenge for medical ethics. Jl. Amer.Acad. Psychiatry & Law, 38(1), 104-108.

[20] *Davis v. Ayala*, 135 S. Ct. 2187 (2015).

> confinement, into a semi-fatuous condition .. and others became violently insane; others, still committed suicide"). . . .
>
> There is no accepted mechanism [for sentencing judges] to take into account, when sentencing a defendant, whether the time in prison will or should be served in solitary. . . . So in many cases, it is as if a judge had no choice but to say: "In imposing this . . . sentence, the court is well aware that . . . the penal system has a solitary confinement regime that will bring you to the edge of madness, perhaps to madness itself."

Justice Kennedy went on to point out that there has been a growing awareness of this issue in the broader public (citing articles in The New Yorker and in the New York Times), as well as scholarly articles in the academic and medical literature. He goes on to conclude that:

> [R]esearch still confirms what this Court suggested over a century ago: near total isolation exact[s] a terrible price. See, e.g., Grassian, Psychiatric Effects of Solitary Confinement, 22 Wash. U. Jl. L. & Pol'y, 325 (2006). . . .
>
> Over 150 years ago, Dostoevsky wrote, "The degree of civilization in a society can be judged by entering its prisons.". . . There is truth to this in our own time.

**4.      The Particular Vulnerability of Inmates with Serious Mental Illness**

Certain groups of individuals will be especially vulnerable to the psychiatric toxicity of solitary confinement. For example, individuals with impaired cognitive capacity are even more stimulation deprived because they are unable to generate stimulation internally—by thinking. And individuals with diagnosed mental illness, such as Keith Lowe, are particularly vulnerable in solitary; they will suffer far greater psychiatric harm, so much so that a number of jurisdictions in the United States have banned any use of solitary confinement with individuals with diagnosed mental illness, or have agreed to severely limit its use.[21] There are several factors explaining the particular vulnerabilities of those with mental illness. These include:

---

[21] See, for example:
   Philadelphia Inquirer, Jan. 7, 2015. "Deal aims to end solitary confinement for seriously mentally ill prisoners in Pennsylvania". (Result of an investigation by the Department of Justice).
   The Saratogian, June 13, 2017. "NY lawmakers under pressure to ban use of solitary confinement."

### 4.1. Mentally Ill Inmates Are More Likely to Commit Infractions Leading to Confinement in Solitary

Statistical studies in the United States have shown that those who commit criminal infractions are likely to have pre-existing mental health problems, demonstrating that approximately 75% of jail and prison beds in the U.S. are occupied by individuals whose committing offense was a product of mental illness and/or substance abuse. Moreover, among those in prison, inmates with serious mental illness are disproportionately represented among those in solitary confinement.

This is not surprising; those inmates such as Mr. Lowe who have difficulty adjusting to imprisonment are very likely to have one of the following impairments: 1) emotional over-reactions leading to impulsive behavior, and/or 2) an inability to understand and respond appropriately in interpersonal relationships, resulting in either interpersonal violence or bullying, and/or 3) paranoia—a tendency to perceive others as threatening or humiliating.

---

Washington Post Jan. 25, 2017. Op-ed by President Obama: "Why we must rethink Solitary Confinement."
New Jersey Spotlight, Oct. 9, 2017. "Curbing use of solitary confinement in NJ Correctional Facilities."
Boston Globe, Dec. 31, 2016. "Advocates: Mass. Unlawfully isolates mentally ill inmates." (commenting on a consent decree banning mentally ill inmates from solitary).
Los Angeles Times, June 5, 2014. "Colorado bans solitary confinement for seriously mentally ill."
The Marshall Project, Dec 23, 2014. "Shifting away from solitary." (detailing reforms including the banning of solitary for the mentally ill in a number of U.S. jurisdictions).
Solitary Watch, Feb. 11, 2016: "Settlement limits solitary confinement of inmates with serious mental illness in Indiana's prisons."
Report from U.S. Senate committee, Feb. 25, 2014. "No solitary for minors, mentally ill."
Star Tribune, Minneapolis, Feb. 3, 2017. "Legislators push to limit solitary confinement, ban it for mentally ill."
Report of The Association of State Correctional Administrators and The Arthur Liman Public Interest Program at Yale Law School, Nov. 2016. "Aiming to reduce time-in-cell: Reports from correctional systems on the numbers of prisoners in restricted housing and in the potential of policy changes to bring about reform." (describing efforts to eliminate or restrict the use of solitary with mentally ill inmates).

### 4.2. The Mentally Ill Will Suffer More Harm, and More Permanent Harm, from Confinement in Solitary

It is of course not surprising that compared with others, individuals with serious mental illness have less resilience in the face of psychological stress. They more readily become symptomatic; they become more severely symptomatic; and they have fewer (and generally less successful) means of coping with stress. Moreover, as a result, compared with others, their functioning and behavior becomes more impaired by stress.

One of the major concerns in treating individuals with serious mental illness is that as a result of stress inducing more severe symptoms and their having fewer coping strategies, when they do have a psychiatric setback—some level of decompensation from their baseline functioning—they have a much harder time recovering from it. They have lost something and cannot get it back fully, or even at all. In other words, serious mental illness tends to be progressive; with each episode, it tends to get worse, and over time, the individual becomes more symptomatic, more impaired in functioning. Thus, much of the therapeutic effort needed is prophylactic, an effort to prevent episodes of psychiatric decompensation.

### 4.3. Concern Regarding Obstacles to Treatment

Solitary confinement creates obstacles to psychiatric treatment—both psychotherapy and also psychopharmacologic treatment. This is a ubiquitous problem with solitary confinement. It is vitally important that an individual be able to discuss his psychiatric difficulties in privacy, but there are inevitable logistical difficulties and substantial manpower required to accomplish this with an inmate in solitary. Moreover, being taken out of the cell and transported to a private area requires that the inmate be shackled and, in particularly harsh conditions, even strip-searched. Such conditions generally, including those experienced by Mr. Lowe while he was housed in

15

solitary, are done through the cell door, a situation with virtually no privacy at all—a major obstacle to treatment.

Moreover, most inmates in solitary are less likely to feel trusting and safe in revealing their difficulties—and their vulnerabilities—to someone who is part of the prison staff, and thus the lack of privacy is especially problematic. Availability of adequate treatment is severely reduced, and the trust needed for compliance with psychopharmacological treatment and with psychotherapy is severely impacted.

Thus, those individuals who are housed in solitary and suffer from serious mental illness are very unlikely to receive treatment that will maintain their psychiatric stability. Yet these are the individuals most in need of such treatment.

### 4.4. The Specific Impact of the Stress of Solitary Confinement

Unfortunately, the psychiatric impact of solitary confinement exacerbates the burdens of being mentally ill. It is an intrinsically fearful environment with very little opportunity for normal social interaction; an individual already prone to paranoia, or with weak reality-testing, will almost inevitably do badly.

Moreover, individuals with impaired reality-testing—for example, individuals with Schizophrenia, Schizoaffective Disorder, or severe Bipolar Mood Disorder—will be prone to hallucinations and delusions. In my experience, a very high percentage of individuals confined in solitary have disorders in the Bipolar spectrum.[22] These individuals have intense emotional responses and are prone to impulsive, chaotic, and often self-destructive behavior. Solitary confinement is a breeding ground for such reactions.

---

[22] Schizoaffective Disorder has features of both schizophrenia and of bipolar mood disorder.

The intense emotionality of individuals with mood disorders is often manifest as a dangerous depression—one characterized by impulsive and self-destructive behavior, including suicidal behavior. As noted above, statistical data indicates that as many as 50% of all prison suicides occur among those confined in solitary. In my experience with completed suicides in solitary, I have found that the vast majority of these individuals had pre-existing mood disorders such as Bipolar Mood Disorder and Schizoaffective Disorder.

Signed this 8th day of May, 2025.

_____
Stuart Grassian, M.D.