IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**CHARLESTON DIVISION**

KEITH LOWE,

                            Plaintiff,

v.                                                    CIVIL ACTION NO.   2:25-cv-00272

SUPERINTENDENT JOHN FRAME, et al.,

                            Defendants.


**MEMORANDUM OPINION AND ORDER**


        Plaintiff Keith Lowe ("Plaintiff") has been held in solitary confinement for over twelve

years at the Mount Olive Correctional Complex.   The conditions of his confinement include being

held in a six-foot by ten-foot cell for almost the entirety of the day, being let out for "fresh air" in

an equally sized metal cage, and having his contact with others limited.   An unhappy mixture of

Plaintiff's existing mental infirmities and the imposed isolation led him to attempt suicide on April

6, 2025.

        Following this tragic occurrence, Plaintiff filed this pending motion for a preliminary

injunction.[1]   (ECF No. 1–3 at 39–40.)   Plaintiff seeks, *inter alia*, an injunction ordering his

transfer to William R. Sharpe Hospital to treat his risk of suicide.   (*Id.* at 39.)   For the following

reasons, the motion, (ECF No 1-3), is **GRANTED IN PART.**[2]   Defendants Superintendent John

---

[1] As noted at the status conference held on May 1, Plaintiff's motion for a temporary restraining order, (ECF No. 1-3), was denied.

[2] Although Plaintiff moved for a broader injunction prohibiting his return to solitary confinement after his time at a

Frame and Acting Commissioner Lance Yardley ("Defendants") are **ORDERED** to effectuate Plaintiff's requested transfer forthwith.

## I.     BACKGROUND

### A.  Plaintiff's conditions of confinement

In 2005, Plaintiff was convicted of first-degree murder and sentenced to life imprisonment without the possibility of parole.  (ECF No. 28-1 at 1–2.)  Since that time, he has been incarcerated at the Mount Olive Correctional Complex ("Mount Olive").  During Plaintiff's time at Mount Olive, Defendant John Frame has had multiple roles at the prison and in the corrections system generally.  Currently, Defendant Frame serves as the Superintendent of Mount Olive. Unsurprisingly, Plaintiff and Defendant Frame have had numerous interactions with each other.

Plaintiff has been less than a model inmate while at Mount Olive, to say the least.  He has had over fifty substantiated disciplinary write ups levied against him since 2007.  (ECF No. 28 at 4.)  Notable among these write ups are three instances in which Plaintiff made significant escape attempts.  (*Id.* at 2.)

In 2007, Plaintiff pled guilty to an escape attempt where he and another inmate made a grappling hook out of paperclips and trash bags.  (*Id.*)  Defendant Frame was the investigator assigned to this incident.  (*Id.*)  In 2012, Plaintiff again attempted to escape.  This time, he rushed past a door, undeterred after being doused in pepper spray, and ultimately surrendered to an armed guard while trying to climb a fence.  (*Id.* at 2–3.)  In 2020, curious circumstances led Plaintiff to attempt to escape while in the recreational yard using a water hose.  (*Id.* at 3.)  For

psychiatric facility, the Court will not address that part of the motion in this order.

each of these attempts, Plaintiff was given sixty-days punitive segregation and loss of privileges.[3] (*Id.* at 2–3.)

At some point in 2012, it appears the correctional staff ran out of patience.   As a result of his extensive disciplinary history, Plaintiff was placed in a status known as "3D."   (ECF No. 10 at 3.)   That has resulted in him being housed in "permanent" solitary confinement in the Quilliams II unit at Mount Olive.   (*Id.*)   He has been held in this status and in solitary confinement since that time.

The conditions of this solitary confinement are quite bleak.   Plaintiff states he is held in a six-foot by ten-foot cell[4] for twenty-three to twenty-four hours per day.   (*Id.* at 6.)   For one hour a day, Plaintiff is allowed to leave his cell to shower or go outside for "fresh air" in a metal cage comparable in size to his cell, that neither gets direct sunlight, nor affords Plaintiff the ability to exercise.   (*Id.*)   Plaintiff is also restricted from interacting with other inmates while he is outside of his cell.   (*Id.*)   Defendants have not disputed Plaintiff's description of his confinement.

Plaintiff's mental illnesses have compounded his situation.   Long before his incarceration, Plaintiff suffered from a number of severe mental illnesses.   These have included bi-polar disorder, post-traumatic stress disorder, borderline personality disorder, anti-social disorder, anxiety, ADHD, and paranoid schizophrenia.   (*Id.* at 3–4.)

---

[3]  Plaintiff was also convicted of an "escape" when he "slipped a cuff" off, but then slipped his hand back into the cuff and returned to his cell without incident.   (*See* ECF No. 28 at 3–4.)   At the preliminary injunction hearing, Plaintiff seemed to concede that this was technically an escape, but also noted it was "plain foolishness."   In the Court's view, this incident stretches the word "escape" beyond recognition.   If anything, it would be better characterized as poor handcuffing by some unknown correctional officer.

[4]  For reference, the average parking spot is approximately nine-feet by eighteen-feet, or almost three times the size of Plaintiff's cell.   *See Thorpe v. Clarke*, 37 F.4th 926, 931 (4th Cir. 2022).

Defendants have known of these illnesses, not least because they knew of Plaintiff's treatment during his incarceration. (*Id.* at 4.) As part of that treatment, Defendants contract services with PsiMed Corrections, LLC ("PsiMed") to provide inmates like Plaintiff psychiatric care. (*Id.* at 3.) Plaintiff further asserts that, even with the medications he takes, he continues to suffer from depression and anxiety. (*Id.* at 4.)

In fact, Plaintiff avers that his mental health has worsened as a result of his prolonged solitary confinement. (*Id.* at 7.) Such instances of deterioration include his reports to Defendants that he hears voices in his head. (*Id.*) Plaintiff states that he has made Defendants aware of his failing mental health through written requests, grievances, verbal statements, and lawsuits. (*Id.*) Further, Defendants were aware of an instance in which Plaintiff attempted to take his life through self-mutilation in 2023. (*Id.*) Despite all of this, Plaintiff remained in solitary confinement.

### B. Plaintiff's April 2025 suicide attempt

On February 5, 2025, Plaintiff met with a PsiMed therapist who completed a suicide risk assessment of him. (*Id.* at 8.) The therapist noted that Plaintiff "states that he always thinks about harming himself but has no intent or plan to do so at this time." (*Id.*) He also stated that "if he did have a plan he wouldn't tell us [PsiMed]." (*Id.*) The notes further indicate Plaintiff exhibited negative thoughts and has a number of known risk factors associated with suicidal tendencies. (*Id.* at 8–9.)

In the months that followed, Plaintiff struggled to secure a meeting with his PsiMed therapist. (*Id.* at 9.) Apparently sensing his own mental decline, Plaintiff made repeated efforts to see a therapist. (*Id.*) On April 4, just two days before his attempted suicide, Plaintiff was informed that he would be unable to meet with his therapist because the prison was short staffed.

4

(*Id.*)

On April 6, 2025, Plaintiff attempted to take his own life again, this time by overdose. (*Id.*)  About an hour after he ingested the drugs, prison staff found Plaintiff slumped over and unresponsive.  (*Id.* at 10.)  Fortunately, he was administered Narcan twice and revived.  (*Id.*) Plaintiff was then transferred to a local hospital, but then returned back to the prison shortly thereafter.  (*Id.*)  Plaintiff was then placed on suicide watch, where he apparently made statements to staff, including "I wish I could go to sleep and not wake up."  (*Id.*)

Approximately forty-eight hours after he attempted to take his life, Plaintiff was returned to the same solitary confinement, where he has been kept alone, in a cage, for over a decade.  (*Id.* at 11–12.)

### C. *Plaintiff's suit and procedural history*

Plaintiff initially filed this instant suit in state court, but the case was removed to federal court by PsiMed.[5]  In his Complaint, Plaintiff alleges a cause of action under 42 U.S.C. § 1983 because Defendants deprived him of his Eighth Amendment rights.  (*Id.* at 13–14.)  Specifically, Plaintiff alleges Defendants exercised deliberate indifference to his serious medical needs.  (*Id.*) Contemporaneous with his Complaint, Plaintiff filed an Emergency Motion for Temporary Restraining Order and Preliminary Injunction.  (ECF No. 1-3 at 39–40.)  Plaintiff sought relief from the Court, including: "[a]n injunction requiring Defendants to file a petition to transfer [Plaintiff] to a state psychiatric facility for treatment and stabilization, until such time as he is no longer suicidal"; "[a]n injunction requiring Defendants to provide appropriate mental health care"

---

[5] PsiMed was previously a defendant in this case until Plaintiff stipulated to voluntarily withdraw his claims against PsiMed on May 21, 2025.  (*See* ECF No. 36.)

once he is returned to Mount Olive; "[a]n injunction forbidding Defendants from continuing to house [Plaintiff] in a segregation unit; and "[a]ny other equitable relief the Court deems appropriate."   (*Id.*)

At the May 1, 2025 status conference, the Court denied Plaintiff's motion for a temporary restraining order, but ordered Defendants to brief the motion for a preliminary injunction.   (ECF No. 11.)   The parties filed respective briefs.   (ECF Nos. 1-3, 27, and 28.)   On May 14, 2025, the Court heard testimony and argument from each side.   At the conclusion of the hearing, Plaintiff's counsel only sought a ruling on the issue of his transfer to a psychiatric facility while leaving the rest of his requested relief pending.   The matter is now ripe for adjudication.

## II.    LEGAL STANDARD

Federal Rules of Civil Procedure 65 governs the issuance of a preliminary injunction.   A preliminary injunction issued under Rule 65 serves "as a means of preventing harm to one or more of the parties before the court can fully adjudicate the claims in dispute."   *Williams v. Rigg*, 458 F. Supp. 3d 468, 473 (S.D. W. Va. 2020).   Preliminary injunctions are "never awarded as of right." *Id.* (citing *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 345 (4th Cir. 2009)).   That is because a preliminary injunction is an "extraordinary remed[y] involving the exercise of very far-reaching power."   *MicroStrategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001).   Accordingly, the Court should issue preliminary injunctions "sparingly and in limited circumstances."   *Id.*

In order for the Court to issue this extraordinary remedy, the Court must find that Plaintiff has satisfied the four factors set by the Supreme Court in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008).   First, the movant must sufficiently prove that he "is likely to

succeed on the merits" of his underlying claim.  *Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023) (citing *Winter*, 555 U.S. at 20).   Second, the movant must show that he "is likely to suffer irreparable harm in the absence of preliminary relief."  *Id.*   Third, the movant must demonstrate "that the balance of the equities tips in his favor."  *Id.*   Finally, the movant must show "that an injunction is in the public interest."  *Id.*   All four factors "must be established by a 'clear showing'" before a preliminary injunction can be issued.  *Imagine Medispa, LLC v. Transformations, Inc.*, 999 F. Supp. 2d 862, 868 (S.D. W. Va. 2014) (quoting *Real Truth About Obama*, 575 F.3d at 346).   The movant bears the burden of providing a "sufficient factual basis" for granting the injunction "beyond the unverified allegations in the pleadings."  *Id.* at 868–69 (citations omitted).

### III.    ANALYSIS

Defendants contend that Plaintiff cannot meet any of the *Winter* factors and, thus, is not entitled to a preliminary injunction.   (ECF No. 28.)   The Court will analyze each factor in turn. Because this injunction respects prison conditions, the Court will also analyze the requested relief in light of the requirements set forth in the Prison Litigation Reform Act ("PLRA").

### A.  *Plaintiff is likely to succeed on the merits of his deliberate indifference claim*

The first *Winter* factor requires Plaintiff to make a clear showing that he is likely to succeed on the merits of his underlying claim, which is an Eighth Amendment deliberate indifference claim.   (ECF No. 10 at 13–15.)   The Eighth Amendment proscribes the infliction of "cruel and unusual punishment."   U.S. Const. amend. VIII.   More than just merely protecting against the active infliction of pain, the Eighth Amendment requires prison officials to "provide humane conditions of confinement."   *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).   Thus, the

Constitution requires prison officials to provide "adequate food, clothing, shelter, and medical care" to the inmates within their charge. *Id.* A prison official's "deliberate indifference to [the] serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain" forbidden by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quotation omitted).

For Plaintiff to make out a meritorious deliberate indifference claim, he must establish two prongs. The first, "'objective' prong requires [him] to demonstrate that 'the deprivation alleged [was] objectively, 'sufficiently serious.''" *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (citing *Farmer*, 511 U.S. at 834). In medical needs cases, the objective prong requires a showing that the official exhibited "deliberate indifference to a 'serious' medical need that . . . 'is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Id.* (citing *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)). The second "'subjective' prong" requires the plaintiff to show "that prison officials acted with a 'sufficiently culpable state of mind.'" *Id.* (citing *Farmer*, 511 U.S. at 834). In medical needs cases, a plaintiff demonstrates this by showing the official had "actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by [the official's] action or inaction." *Id.* (citing *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014)).

1. The objective prong

The Fourth Circuit has recognized that a "substantial risk of suicide" is "the type of 'harm' that is contemplated by the [objective] prong" of an Eighth Amendment deliberate indifference claim. *See Short v. Hartman*, 87 F.4th 593, 612 (4th Cir. 2023) (citing *Brown v. Harris*, 240 F.3d 383, 389 (4th Cir. 2001)). Indeed, Defendants do not and cannot dispute this legal point. (*See*

8

ECF No. 28 at 9.)

Instead, Defendants appear to dispute whether Plaintiff's risk of suicide is, in fact, substantial. PsiMed, for instance, notes Plaintiff "credibly denied" having thoughts of self-harm on multiple occasions following his suicide attempt. (ECF No. 27 at 25.) Defendants echo that sentiment, noting that "Plaintiff concedes that he reported to a PsiMed employee that he was not suicidal" as a fact mitigating the substantial risk. (ECF No. 28 at 10.) This argument is unpersuasive.

To start, although Plaintiff said to PsiMed staff that he had no plan to commit suicide, he *also* stated to staff that he would not tell them if he was planning on attempting suicide. (ECF No. 10 at 8.) Further, Plaintiff's expert, Dr. Stuart Grassian,[6] testified at the preliminary injunction hearing that individuals who deny suicidal ideation are at times the ones most at risk of completing their attempts. Defendants have offered nothing to dispute that claim. Thus, it can be simultaneously true that Plaintiff denies suicidal intentions and still maintains a substantial risk of attempting suicide again.[7] Further, Plaintiff himself indicated he had thoughts of suicide during the hearing.

Accordingly, at this juncture, Plaintiff is at a substantial risk of suicide and made a sufficient showing under the objective prong.

---

[6] Dr. Grassian is a Board-certified psychiatrist and licensed medical practitioner in Massachusetts. He has extensive experience in the psychiatric effects of prolonged solitary confinement and has given expert testimony on numerous occasions to that effect. (*See generally* ECF No. 34-6 at 1, 19–29.) At the hearing, Defendants did not object to Dr. Grassian being qualified as an expert in his field.

[7] Indeed, Plaintiff testified and presented evidence at the preliminary injunction hearing that shows he continues to engage in self-harm following his attempt in April. (*See* ECF No. 34-5 (image taken by Plaintiff's counsel depicting recent self-harm attempts).)

2.  <u>The subjective prong</u>

The next prong requires Plaintiff to demonstrate Defendants acted with a sufficiently culpable state of mind.   As previously indicated, that requires showing Defendants had (1) actual subjective knowledge of his serious medical condition (here, his suicidal risk) and (2) actual subjective knowledge of the excessive risk posed by their action or inaction.   *See Scinto*, 841 F.3d at 225.   As the Supreme Court has noted in *Farmer* itself, the subjective prong of a deliberate indifference claim involving injunctive relief "should be determined in light of the prison authorities' current attitudes and conduct."   *Farmer*, 511 U.S. at 845 (citing *Helling v. McKinney*, 509 U.S. 25, 36 (1993)).   It is within the discretion of the Court to allow Plaintiff to rely on "developments that postdate the pleadings and pretrial motions," just as the Court may allow Defendants to "rely on such developments to establish that the inmate is not entitled to an injunction."   *Id.* at 846.   As discussed below, Plaintiff has provided enough evidence to meet both components of the subjective prong.

i.  *Defendant's knowledge of Plaintiff's serious risk of suicide*

Plaintiff contends that Defendants have actual subjective knowledge of his serious risk of suicide.   "Whether an official had the requisite knowledge is a question of fact subject to demonstration in the usual ways, and a factfinder may conclude that the official knew of a substantial risk from the very fact that it was obvious."   *Farmer*, 511 U.S. at 826.   The presentation of "direct evidence of a prison official's actual knowledge or circumstantial evidence tending to establish such knowledge" can aid a plaintiff in meeting the subjective prong.   *See Scinto*, 841 F.3d at 226 (citations omitted).

10

Here, Plaintiff puts forward direct evidence of Defendants' knowledge. Plaintiff notes that he made several requests to Defendants to obtain "relief from" the conditions in which he has been kept. (ECF No. 10 at 7.) He notes that he has filed "countless written requests, written grievances, made verbal requests, and even filed lawsuits documenting his mental health struggles, his self-harm, his need for better mental health treatment, and his request to be removed from permanent solitary confinement." (*Id.*; *see also generally* ECF No. 34-3.) Although Defendant Frame denies having seen a letter addressed to him directly, Plaintiff asserts that Defendant Frame has had multiple interactions with him regarding his deteriorating mental health. (ECF No. 1-3 at 51.)

Plaintiff alleges the same of PsiMed. Plaintiff notes that PsiMed has been treating him "for over ten years." (ECF No. 1-3 at 51.) PsiMed does not dispute Plaintiff's claim that he indicated to its staff on February 5, 2025 that he had thoughts of self-harm. (ECF No. 10 at 8.) It also does not dispute that Plaintiff told staff that "if he did have a plan [to act on those thoughts] he wouldn't tell [PsiMed staff]." (*Id.*) Instead, PsiMed staff simply "did not find [Plaintiff's] statement unusual or cause for concern" because he "always voiced having thoughts of suicide," but "disclaimed any plan or intention" to act on those thoughts. (ECF No. 27 at 6 (citations omitted).) PsiMed repeatedly notes that Plaintiff "credibly" denied suicidal intention in the past and—despite attempting suicide—continues to "credibly" deny it now, even after Plaintiff indicated his thoughts of suicide to the Court during the preliminary injunction hearing. At this point, PsiMed's claims of "credible" denials seem debatable, at best.

Overall, it is evident from the record and verified complaint that the Defendants are sufficiently aware of Plaintiff's risk of suicide. It is uncontested that Defendants were aware of

Plaintiff's past suicide attempts, in addition to his deteriorating mental state. The grievances alone have placed the Defendants on notice. If nothing else, Defendants became aware of Plaintiff's suicide attempt after he was found unconscious in his cell. (ECF No. 10 at 10.) This second attempt places Defendants on notice of the substantial risk of attempting suicide again.

No matter the credibility of the denials, the risk of suicide remains apparent. Defendants are clearly aware that Plaintiff attempted suicide in April. Indeed, his two previous attempts have made it apparent that Plaintiff presents as a serious risk of taking his own life. Thus, Plaintiff has sufficiently demonstrated that Defendants knew of his risk of suicide.

> ## ii. *Defendant's Knowledge of the excessive risk posed by their actions and inactions*

In addition to establishing the Defendants' knowledge of the risk of suicide, Plaintiff must also establish that the Defendants knew their actions or inactions posed an excessive risk of that harm. Plaintiff avers that the actions by Defendants were "insufficient to mitigate the risk" of future suicide attempts. (ECF No. 1-3 at 51.) First, Plaintiff alleges that Defendants failed to follow internal procedures by removing him from suicide watch after only two days. (*Id.* at 51–52.) Beyond just a violation of policy, however, Plaintiff presented expert testimony[8] that this move back to solitary confinement was "clinically inappropriate for someone with [Plaintiff's] recent history and known" vulnerabilities. (*Id.* at 52.) At the hearing, Dr. Grassian's testimony corroborated that finding.

---

[8] Prior to the hearing, Plaintiff's expert was Dr. Sofia Sami, a Board-certified psychiatrist and licensed practitioner in Illinois. (*See* ECF No. 1-3 at 59–61.) Her written report and declaration accompanied Plaintiff's pending motion when it was filed in state court.

Plaintiff also notes that Defendants were aware of his risk of suicide prior to the April attempt.   Plaintiff claims that Defendant Frame failed to act despite his knowledge of Plaintiff's deteriorating mental state.   Although Defendant Frame asserts he did not receive a letter from Plaintiff explaining his failing mental condition, Plaintiff presents alternative information that would have placed Defendant Frame on notice.   For instance, Plaintiff notes that Defendant Frame would have been aware that the April episode was his second suicide attempt in three years.   (*Id.*) Such an attempt was apparently documented by Defendants, (ECF No. 10 at 7), a point which Defendants do not dispute.   Plaintiff also made other repeated pleas to Defendants, (*Id.*), including statements that he needed "real mental health help" beyond what was being provided to him. (ECF No. 1-3 at 52.)

As Defendants put it, they are "not healthcare or mental health providers."   (ECF No. 28 at 11.)   To provide those needs, they rely on PsiMed to treat Plaintiff's mental health needs.   (*Id.*) However, Defendants cannot shirk responsibility for providing adequate medical care by outsourcing such care to PsiMed.   A contract between a prison and a third party to provide medical care to inmates "does not relieve the government of its constitutional duty under the Eighth Amendment to ensure the adequacy of the care."   *Scott v. Clarke*, 64 F. Supp. 3d 813, 821 (W.D. Va. 2014) (collecting cases).   Further, when the prison "effectively cedes final decision-making authority with respect to the provision of or failure to provide medical care to a third-party contractor, the contractor's policies and decisions effectively become and constitute the policies and decisions of the [prison]."   *Id.*   Thus, when Defendants rely on the decisions made by PsiMed in the treatment of Plaintiff, those decisions can be attributed to Defendants themselves.

Plaintiff also explains that such healthcare is insufficient to mitigate the real risk of harm. As Plaintiff puts it, PsiMed was made aware of Plaintiff's risk of suicide by the statements he made to staff.  (*See* ECF No. 1-3 at 52–53.)   Staff, however, found those risks not credible. Nevertheless, Plaintiff did attempt suicide.   Following that attempt, PsiMed and its staff apparently continued to find the risk of suicide not credible.  (*Id.* at 53.)   To that extent, Plaintiff has made a sufficient showing that PsiMed knew its inactions posed an excessive risk of harm to Plaintiff.

Importantly, PsiMed did not order Plaintiff back to solitary confinement two days after his suicide attempt, nor is there evidence that it was consulted on this decision.

With the above in mind, Plaintiff has made a clear showing that Defendants knew of the excessive risk of their inaction.   It is clear that Defendants knew of the risk posed to Plaintiff following his suicide attempt in April.   Despite this, Defendants continued to house Plaintiff in the very condition that apparently spurred his attempt.   This is not news to Defendants.   They were aware of Plaintiff's past attempt, his repeated pleas about the effects of solitary confinement on his mental health, and of his complaint about the inadequacy of the treatment he was receiving.

Even assuming that evidence was insufficient to establish the second half of the subjective prong at the time this lawsuit was filed, the state of the current, undisputed record favors Plaintiff. Despite this litigation, Defendants have not made any adjustments to Plaintiff's confinement since the filing of this suit or the testimony presented at the preliminary injunction hearing.[9]   The Court urged the parties—strongly—to come to a solution that would moot the need for injunctive relief.

---

[9]  The Court does note for the record that it learned informally that Defendants did, at the request of the Court, return some personal property to Plaintiff.   However, the Court is unaware of any changes to Plaintiff's housing designation.

That time has passed. What is apparent now is the fact that the Defendants—having heard uncontested expert testimony about the dangers of keeping Plaintiff in solitary confinement given his present state of mind—ignored such warnings and persisted in keeping him in his condition of confinement. Thus, it is apparent to the Court that the Defendants will continue with their inaction unless the Court instructs them otherwise.

Given all of the above, the Court finds that Plaintiff has met his burden under the subjective prong.

### iii.  The reasonableness of Defendants' response

In an effort to thwart Plaintiff's deliberate indifference claim, Defendants assert that, even assuming they had subjective knowledge of the excessive risk, they are not liable because their actions were reasonable. A plaintiff cannot establish an Eighth Amendment claim, even if the official "actually [knows] of a substantial risk to inmate health or safety," if a prison official "responded reasonably to the risk." *Brown*, 240 F.3d at 389.

Again, Defendants rely on the treatment provided to Plaintiff leading up to and after his latest suicide attempt. Defendants draw the Court's attention to the multiple visits by PsiMed staff in the months leading up to the attempt, the administration of Narcan when Plaintiff was discovered unconscious, the admission to the hospital, and his placement on—then removal from—suicide watch. (ECF No. 28 at 10.) Defendants claim that they were "acting reasonably" by "ensuring the Plaintiff has received adequate mental health care" through PsiMed following his last suicide attempt. (*Id.* at 11.)

The argument that Defendants provided adequate mental health treatment following the Plaintiff's attempt, however, misses the mark. Plaintiff has shown, through undisputed expert

15

testimony, that the combination of his serious mental health history, his extraordinary period of solitary confinement with no end in sight, an actual attempt, and then sending him back to solitary confinement only two days after a suicide attempt was not reasonable.

Staffing shortages were among the reasons Plaintiff was unable to meet with his therapist just prior to his suicide attempt. That situation is understandable and reflects the unfortunate circumstances many prisons face on a day-to-day basis. However, if Plaintiff cannot have access to critical mental health services at a time in which he is vulnerable to committing suicide, then that indicates WVDCR is not capable, even if it is willing, of treating Plaintiff for his suicidal risk. Defendants' efforts are simply inadequate to meet the moment in this particular case.

### iv. Defendants' shortcomings are beyond mere negligence

Defendants further characterize Plaintiff's real complaint as negligence rather than deliberate indifference. Under the subjective prong, proving a sufficiently culpable state of mind requires Plaintiff to show that Defendants' acts were "'more than mere negligence,' but 'less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result.'" *Scinto*, 841 F.3d at 225 (quoting *Farmer*, 511 U.S. at 835). Thus, an inmate's claim of "mere negligence or malpractice does not violate the Eighth Amendment." *Miltier v. Beron*, 896 F.2d 848, 851 (4th Cir. 1990) (overruled on other grounds) (citing *Estelle*, 429 U.S. at 106 (1976)). Rather,

> [d]eliberate indifference may be demonstrated by either actual intent or reckless disregard. A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position.

*Id.* (internal citations omitted). "Likewise, disagreements between a health care provider and the

16

inmate over . . . the proper course of treatment [is] not sufficient to support a deliberate indifference claim, and questions of medical judgment are generally not subject to judicial review." *Insco v. Wexford Health Solutions, Inc.*, 2021 WL 4782273, at *4 (S.D. W. Va. Oct. 13, 2021) (citing *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985)).

Defendants believe that any complaint regarding the care given to Plaintiff is unactionable negligence. They claim that "Plaintiff, at best, arguably states a claim of common negligence" rather than a "violation of [his] Constitutional rights." (ECF No. 28 at 11.) PsiMed notes that Plaintiff's expert opinion that its actions were arguably a deviation from the standard of care is "certainly relevant to a claim of negligence, but not one for deliberate indifference." (ECF No. 27 at 23.) In any event, PsiMed claims that their actions in the immediate aftermath of Plaintiff's attempt comported with that standard. (*Id.* at 23–24.)

Because of the truncated briefing schedule, Plaintiff was unable to respond to this point directly. Nevertheless, the arguments presented by Plaintiff sufficiently demonstrate Defendants' actions were more than mere negligence. Defendants know of the risks Plaintiff faces while being kept in solitary confinement. They first know of this risk because the undisputed testimony of Dr. Grassian indicated as much. However, Defendants really did not need an expert to reveal that risk to them anyways. They have seen Plaintiff's risk of suicide play out right in front of them. First, Plaintiff states he is depressed and has thoughts of self-harm. (ECF No. 10 at 8.) Then, PsiMed determines that the risk is not credible. (*See id.*; *see also* ECF No. 27 at 5–6.) Finally, as Plaintiff remains in solitary confinement, he eventually acts on those suicidal thoughts. (ECF No. 10 at 9–10.)

17

It appears that the cycle has started again.  (*See id.* at 11 ("Since being returned to the segregation unit, Mr. Lowe has continued to feel hopeless and depressed and continues to have panic attacks.").)  PsiMed may think the risk is credibly denied, (*See* ECF No. 27 at 11–12), but neither PsiMed nor Defendants have adequately explained why this instance is different as opposed to the other, evidently not credible, denials of suicidal intent in the past.   If this action was a claim for retrospective relief, then the past actions of Defendant could potentially be characterized as negligence.   Given that this is prospective relief, however, Defendants actually have the benefit of hindsight.   Failing to act on the information they now possess is the kind of "disregard [of] an excessive risk to inmate health or safety" that *Farmer* proscribes.   511 U.S. at 837.   "[P]rison officials may not simply bury their heads in the sand and thereby skirt liability."  *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015).   Accordingly, Defendants may not "skirt liability" here by simply claiming it is merely "negligent" for them to not act on the known risks.

> v.  *Defendants' legitimate penological interest in keeping Plaintiff in solitary confinement*

Defendants claim that keeping Plaintiff in solitary confinement as opposed to transferring him to Sharpe Hospital is reasonable in light of the security risk Plaintiff poses.   (*Id.* at 11–12.) In considering an Eighth Amendment claim as this one, the Court must also "consider [a] Defendants' penological justification" for keeping an inmate in solitary confinement.   *Porter v. Clarke*, 923 F.3d 348, 362 (4th Cir. 2019).[10]   Thus, "the presence of a legitimate penological

---

[10] Defendants cite *Johnson v. Jabe*, 2010 WL 3855217, at *5 (W.D. Va. Aug. 24, 2010) for the proposition that a four factor balancing test guides the Court's assessment of the legitimate penological interests of the prison.   However, that case is in the context of exercising First Amendment rights in prisons.   *Porter*, on the other hand, does not indicate that such a balancing test is required.

justification" can "undermine[] the notion that [an official] acted with deliberate indifference." *See Yates v. DeGeare*, 2024 WL 1482398, at *4 (E.D. Va. Feb. 27, 2024).

Defendants assert that keeping Plaintiff in solitary confinement serves such a purpose. They note that placing Plaintiff "in a less secure setting creates an escape risk." (ECF No. 28 at 15–16.) The three escape attempts by Plaintiff stand as a testament to that risk. (*Id.* at 2–3.) While Plaintiff could be removed from solitary confinement, Defendants assert that he "simply fails to stay out of administrative trouble long enough to demonstrate that he would be a good candidate for less-secure detention." (*Id.* at 16.) Thus, Defendants believe that the only practical solution—even despite his suicide attempts—is for them to engage in the "appropriate exercise of executive authority" and keep Plaintiff in solitary confinement at Mount Olive. (*Id.*)

However, the state of the record makes these justifications seem a bit puzzling. For instance, it is uncontested that Plaintiff's last serious attempted escape was in 2020. Five years have since passed, leading the Court to question what future risk of escape Plaintiff poses. Further, the Court was left with the impression after the hearing that Plaintiff's propensity for escape seems to have receded recently. Perhaps more troubling, though, is the fact that Defendant Frame indicated that a gap in write ups would be helpful to getting Plaintiff assigned out of solitary confinement. Yet it was uncontested that Plaintiff had no write ups since 2022.[11] The state of the record now makes it seem less like the legitimate pursuit of penological interest and more akin to arbitrary decisions by prison staff. Based on the record before the Court now, it seems that Plaintiff has established enough evidence to overcome Defendants' challenge.

---

[11] The Court notes that Plaintiff was written up for obtaining the drugs he used to attempt suicide. While Defendants call this "appropriate discipline" for violations of prison policy, the Court is not holding this latest write up against Plaintiff.

Thus, under the first *Winter* factor, the Court finds that Plaintiff is likely to succeed on the merits.

### B. *Plaintiff is likely to suffer irreparable harm absent injunctive relief*

The next *Winter* factor requires Plaintiff to demonstrate he will suffer irreparable harm unless he is granted injunctive relief.  Plaintiff notes that his "serious mental illness, very recent and serious suicide attempt, and the well-recognized dangers of long-term solitary confinement" all indicate that he is at risk of attempting suicide again.  (ECF No. 1-3 at 54.)  He notes that keeping him in solitary confinement pending adjudication on the merits places him "at [a] high risk of another, upcoming, potentially lethal suicide attempt."  (*Id.* (quotation omitted).) Plaintiff's expert, Dr. Grassian, corroborates as much.  As a general matter, Dr. Grassian notes that those in solitary confinement are at a significantly increased risk of suicide.  (ECF No. 38-6 at 9.)  After observing Plaintiff testify at the preliminary injunction hearing, Dr. Grassian further indicated that Plaintiff himself has a substantial risk of completing a suicide attempt while he remains in solitary confinement.

Once again, Defendants cite the fact that "Plaintiff himself reports that he is no longer suicidal" as a reason he cannot demonstrate irreparable harm.  (ECF No. 28 at 7.)  Similarly, PsiMed characterizes Plaintiff's complaint as "speculation" and "no more than a personal disagreement with his doctors."  (ECF No. 27 at 26 (citation omitted).)  As such, it claims that the harm here is speculative because Plaintiff "has not attempted suicide again."  (*Id.* at 26–27.) PsiMed notes that it "remains able to provide [Plaintiff] with appropriate mental health care."  (*Id.* at 27.)

20

The fact that Plaintiff has not attempted suicide again, however, is not relevant.  A party "does not have to await the consummation of threatened injury to obtain [injunctive] relief." *Friends of the Earth, Inc. v. Gaston Copper Recycling Co.*, 204 F.3d 149, 160 (4th Cir. 2000) (citing *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 298 (1979)).  The threat of suicide here is more than mere speculation.  Plaintiff's past suicide attempts demonstrate that the threat is real.  Beyond that, Dr. Grassian indicated at the hearing that Plaintiff's continued confinement in the conditions he challenges is likely to cause him to attempt again.  By "[s]imply returning [Plaintiff] to segregation without meaningful intervention," Plaintiff's "acute risk [of suicide]" is not mitigated.  (ECF No. 1-3 at 54 (citing *id.* at 59).)

As discussed previously, Plaintiff's denials are of no moment either.  Defendants have not rebutted Dr. Grassian's testimony, which indicated that denial of suicidal intent by someone in Plaintiff's situation heightens, rather than abates, the risk of completing suicide.  Although Defendants may characterize their own efforts as sufficient, Defendants do not fully grapple with the testimony presented.  Dr. Grassian's testimony indicated that Plaintiff's relationship with his PsiMed therapist was helpful, but ultimately inadequate for the immediate threat he presently faces.  Without lifting the underlying condition until the risk of suicide subsides, Plaintiff's risk of suicide will continue to loom.  On the record presently before the Court, Plaintiff has made a sufficient showing of a likelihood of irreparable harm.  Therefore, the second *Winter* factor weighs in Plaintiff's favor.

### C.  The balance of equities and the public interest tip in Plaintiff's favor

When the government is the party opposing a preliminary injunction, *Winter* factors three and four merge.  *See Pierce v. North Carolina State Board of Elections*, 97 F.4th 194, 225 (4th

21

Cir. 2024) ("Plaintiffs must show 'that the balance of equities tips in [their] favor' [*Winter* factor three] and 'that an injunction is in the public interest.' [*Winter* factor four] . . . These 'factors merge when the Government is the opposing party.'") (citations omitted).   Here, Plaintiff argues that these factors weigh in his favor.   As to the balance of the equities, Plaintiff argues that his long-term placement in solitary confinement puts him at risk of "not merely attempting suicide, but eventually succeeding" at those attempts.   (ECF No. 1-3 at 54–55.)   He further states that he is "totally reliant" on Defendants to respond appropriately to his serious mental health issues.   (*Id.*)   This, he asserts, they have not done.   (*Id.*)   The harm to him is "potentially fatal," while Defendants will suffer "no injury" from him being placed at Sharpe Hospital.   (*Id.*)   Sharpe Hospital, which also houses other violent criminals, would not be burdened either.   (*Id.*)   Plaintiff also asserts that the public interest is served by preventing an inmate death and by "promot[ing] constitutional conditions of confinement" within the West Virginia penal system.

Defendants do not dispute the need to provide Plaintiff with adequate medical care, but do dispute that those needs tip the balance of the equities in his favor.   (ECF No. 28 at 12.) Defendants voice their concern that "facility staff, the public at large, and the Plaintiff himself" would be placed at risk if he were transferred to a facility like Sharpe Hospital.   (*Id.*)   They are concerned that Plaintiff cannot be deterred from an escape from Sharpe Hospital since "there is no practical legal deterrent to prevent him from attempting to escape" from that facility.   (*Id.* at 8.) The facility is not as secure as Mount Olive, making Plaintiff's "propensity for violence" and escape a significant risk.   (*Id.* at 12.)   Finally, they continue to assert that "PsiMed, [WVDCR's] service provider, can adequately address the Plaintiff's mental health problems."   (*Id.* at 13.)

The Court takes seriously the fact that it should not ordinarily "immerse [itself] in the management of state prisons or substitute [its] judgment for that of the trained penological authorities charged with the administration of such facilities." *Taylor v. Freeman*, 34 F.3d 266, 268 (4th Cir. 1994). When "extraordinary circumstances" arise, however, the Court does act within its bounds. *Cf. id.* As the Court has already found, the efforts made by Defendants to mitigate the risk of harm falls short of what is necessary to meet the immediate need. *Cf. Halliman v. Scaratino*, 466 F. Supp. 3d 587, 609 (E.D.N.C. 2020) (denying a preliminary injunction on the third and fourth *Winter* factors because prison officials acted reasonably in their response to COVID-19). By failing to adequately address the underlying factors associated with the increased risk of suicide—*i.e.* unending solitary confinement combined with serious mental illness—Plaintiff remains at that risk without injunctive relief.

The Court is not insensitive to Defendants' legitimate concerns over the safety of the public. A risk of inmate escape is a serious concern that a Court must soberly consider. However, this case has mitigating circumstances that reduces that immediate concern. First, there is a notable gap between Plaintiff's last significant escape attempt and his last suicide attempt. Second, it appears from the record that other dangerous criminals are also housed at Sharpe Hospital with apparently little incident. (*See* ECF No. 1-3 at 55.) Third, until his suicide attempt, there appears to have been a significant gap in write ups—one of the criteria that Defendant Frame himself indicated would assist Plaintiff in getting out of solitary confinement permanently. Finally, these past escape attempts are not exactly of the caliber of Andy Dufresne.[12] They represent, as Defense counsel agreed at the preliminary injunction hearing, a situation more akin

---

[12] *See* The Shawshank Redemption (Castle Rock Entertainment 1994).

23

to attempts, and in the Court's view, not very promising ones. The facts of this case simply do not seem to outweigh the legitimate risk to life that Plaintiff faces without relief. Thus, the third and fourth *Winter* factors tip in Plaintiff's favor.

### D. The scope of the preliminary injunction is consistent with the PLRA

Having found that Plaintiff made a clear showing under the *Winter* factors, the Court turns next to the requirements it must follow under the PLRA. Preliminary injunctions respecting prison conditions must comport with the provisions set forth in 18 U.S.C. § 3626(a)(2). That provision of the PLRA states that, when confronted with a civil action respecting prison conditions, any "[p]reliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." *Id.* In considering those factors, "[t]he court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief." *Id.*

First, the Court has exercised restraint in not ruling on all of Plaintiff's requested relief at this time. By only addressing the immediate harm Plaintiff presently faces, the Court is taking every effort to avoid overbreadth. The Court has narrowly drawn its ordered relief by only requiring Defendants to do their part in effectuating the transfer of Plaintiff to Sharpe Hospital for stabilization. The Court has not fashioned any remedy relating to the ultimate question of the constitutionality of Plaintiff's possible future solitary confinement. Given that Sharpe Hospital also houses other inmates convicted of serious offenses, it would not be more "intrusive" than necessary to have Plaintiff housed there pending stabilization.

Further, the Court has given appropriate weight to the legitimate safety and operational concerns of Defendants.  As indicated above, the Court has considered Plaintiff's past escape attempts and the arguments Defendants made regarding them.  The Court appreciates the seriousness of those concerns.  As previously stated, however, the Court does not find that the present record supports the conclusion that these past instances are sufficient to outweigh the immediate risk to life posed to Plaintiff.

Finally, the Court has considered the interests of comity in fashioning its remedy.  As Plaintiff explains, state law establishes a system where by Defendant Frame can effectuate the transfer of Plaintiff in accordance with this order.   (*See* ECF No. 1-3 at 55 (citing W. Va. Code § 27-5-2(b).)  Thus, the Court's order does not require Defendant Frame "exceed his . . . authority under [West Virginia] law."   18 U.S.C. § 3626(a)(1)(B).

The direction of this injunction is limited by the PLRA.  According to the statute, "[p]reliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of [final] prospective relief" before expiration of the preliminary injunction.  18 U.S.C. § 3626(a)(2).

The scope of this relief respects only Plaintiff's request for an injunction ordering that he be sent to a psychiatric facility, such as Sharpe Hospital.  This order does not address the other requests for preliminary injunctive relief.   Thus, such relief remains pending before the Court and may be addressed later should the need arise.   While this order may expire within ninety days of its entry, the Court can and will decide on the remaining relief sought in the motion for a preliminary injunction if it must.  Further, the Court will decide on a permanent injunction if it finds it necessary to do so.  Perhaps it will not come to that.  If the parties find a solution that

obviates the need for the Court's involvement, that would of course be preferred.    The Court hopes it will find itself in such a situation within ninety days.   If not, then it will continue to give the relief necessary.

### *IV.    CONCLUSION*

Plaintiff is convicted of a heinous crime, and the Court was left with the impression after the preliminary injunction hearing that Plaintiff is a thorn in the side of the administration of Mount Olive.   Even so, this is the United States of America and we have a Constitution that sets certain minimum standards for the treatment of inmates, even disagreeable or dangerous ones.   The Plaintiff came to this Court with largely undisputed evidence compelling this Court's findings herein and the relief it grants ***on this record***.   In response, the Defendants came to this proceeding armed with, well, not much.

For all the reasons stated above, Plaintiff's motion for a preliminary injunction is **GRANTED IN PART** to the extent that it requires Defendants to effectuate his transfer to a state psychiatric facility.   (ECF No. 1-3 at 39–40.)   The Court **ORDERS** that Defendants accomplish this **FORTHWITH**.

In light of the Court's findings regarding the absence of any meaningful harm to Defendants related to this injunction, as well as the likelihood that Plaintiff will succeed on the merits of his claim, the Court **ORDERS** that the security required by Federal Rules of Civil Procedure 65(c) be set at **ZERO.**   *See, e.g., Doe v. Pittsylvania*, 842 F. Supp. 2d 927, 937 (W.D. Va. 2012).

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:        May 23, 2025

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE