IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA

**KEITH LOWE,**

    **Plaintiff,**

v.                                         Civ. Act. No: 2:25cv272

**SUPERINTENDENT JOHN FRAME,**
**ACTING COMMISSIONER LANCE YARDLEY,**
**AND SECRETARY MICHAEL CARUSO,**

    **Defendants.**

## SECOND AMENDED
## COMPLAINT FOR INJUNCTIVE RELIEF

Plaintiff Keith Lowe, by counsel Lydia C. Milnes and Lesley M. Nash and the law firm of Mountain State Justice, Inc., files this second amended complaint for injunctive relief, to join Defendant Michael Caruso in this matter. On April 6, 2025, after pleading for mental health treatment to no avail, Mr. Lowe attempted to commit suicide while in his solitary confinement cell at Mount Olive Correctional Complex and Jail. Fortunately, Mr. Lowe's unconscious body was discovered in time to resuscitate him. Plaintiff now seeks to enforce an emergency injunction to obtain access to the mental health treatment he needs to prevent another suicide attempt.

## PARTIES

1. Plaintiff Keith Lowe is an inmate at Mount Olive Correctional Complex and Jail ("MOCC"), located in Fayette County, West Virginia, where he has been held in solitary confinement for the last twelve and a half years. Mr. Lowe has a history of serious mental illness dating back to his childhood, including diagnoses of paranoid schizophrenia, bi-polar disorder, post-traumatic stress disorder, depression, anxiety, and antisocial personality disorder.

2. Defendant John Frame is the superintendent of MOCC. In that capacity, Mr. Frame is responsible for the care and wellbeing of all individuals incarcerated at MOCC. Among other things, Mr. Frame is required to ensure that all individuals confined in his facility are afforded at least the minimum level of healthcare—both physical and mental—required by the United States Constitution and the West Virginia Constitution. Mr. Frame is additionally responsible for ensuring adequate staff are available to perform necessary functions within the facility, and has ultimate authority over decisions regarding housing, security, transportation, and other daily operations of the facility.

3. At all relevant times, Defendant John Frame was acting under the color of state law. Defendant Frame is named solely in his official capacity for the purposes of seeking declaratory and prospective injunctive relief.

4. Defendant Lance Yardley is the Acting Commissioner of the West Virginia Division of Corrections and Rehabilitation ("WVDCR"). WVDCR is the administrative division of the West Virginia Department of Homeland Security, tasked with administering and exercising direct and effective control over prisons and jails in West Virginia, including MOCC. As the Acting Commissioner of WVDCR, Defendant Yardley is vested with executive authority and responsibility for the administration, operation, and control of all WVDCR facilities and employees. Defendant Yardley's duties include establishing, monitoring, and enforcing policy directives and procedures that ensure constitutional confinement and treatment of all people in the custody of the WVDCR. Among other things, Acting Commissioner Yardley is charged with ensuring that inmates receive appropriate medical and mental health treatment while housed in any West Virginia prison. Because WVDCR has delegated its obligation to provide medical and mental health care to private contractors, Defendant Yardley is responsible for ensuring those contractors

meet their obligations of providing constitutionally adequate medical and mental health care to all individuals committed to WVDCR's care and custody.

5.  Defendant Michael Caruso is the Cabinet Secretary of the West Virginia Department of Health Facilities ("WVDHF"). WVDHF coordinates, oversees, and provides direction to state-owned health care facilities, including two acute psychiatric hospitals, including the William R. Sharpe Psychiatric Hospital ("Sharpe"). Sharpe is a 200-bed acute care psychiatric facility located in Weston, West Virginia, that has a designated forensic patient wing, and regularly accepts forensic patients ordered through the judicial system.

6.  At all relevant times, Defendant Caruso was acting under the color of state law. Defendant Caruso is named solely in his official capacity for the purposes of seeking declaratory and prospective injunctive relief.

## FACTS

7.  Plaintiff Keith Lowe has been housed in solitary confinement within the Quilliams II Unit at MOCC since July 2012. Mr. Lowe has been placed on what is known as "3D" status, which is permanent administrative segregation. Thus, Mr. Lowe has no path to leaving solitary confinement.

<u>Mr. Lowe's Long, Well-Documented History of Mental Illness</u>

8.  Plaintiff Keith Lowe has a long history of severe mental illness. He was diagnosed at a young age with paranoid schizophrenia, and before being incarcerated, had been diagnosed with bi-polar disorder, psychotic disorder (NOS), post-traumatic stress disorder, borderline personality disorder, anti-social disorder, anxiety, and ADHD, in addition to paranoid schizophrenia.

9. Defendants are well-aware of Plaintiff's serious mental illness. Plaintiff is treated for his mental illness through prescription medications, which have changed over the years.

10. Currently, Defendants have diagnosed Mr. Lowe with Unspecified Depressive Disorder, Unspecified Anxiety Disorder, and antisocial personality disorder.

11. Mr. Lowe is currently prescribed Bupropion (an antidepressant), Risperidone (used to treat schizophrenia), Duloxetine (antidepressant and antianxiety), Abilify (used to treat bi-polar disorder), and Trihexyphenidyl (a/k/a Artane), which is needed to address stiffness, tremors, spasms, and poor muscle control that are side effects from some of the other medications. He is additionally prescribed Keppra, Gabapentin, and Levetiracetam for epilepsy.

12. Upon information and belief, many of these medications—including Bupropion, Risperidone, Artane, and Keppra—have the potential side effects of causing grogginess, confusion, drowsiness, and forgetfulness. Mr. Lowe experiences these side-effects when taking his prescribed medications. Moreover, Mr. Lowe believes that Abilify, in particular, causes grogginess, confusion, dizziness, and blurred vision. Mr. Lowe knows that Abilify helps to keep the voices in his head at bay, but the side effects are overwhelming.

13. Indeed, Federal Magistrate Dwayne L. Tinsley recently recognized Mr. Lowe's inability to represent himself as a result of the side effects of his medications and appointed the undersigned counsel to represent Mr. Lowe in an ongoing federal civil case. *Lowe v. Ames*, 2:22cv434 (S.D.W. Va. Jan. 24, 2024) at Dkt. No. 32.

14. Because Mr. Lowe's medications, when taken as currently prescribed, cause serious negative side effects, Mr. Lowe sometimes refuses to take the medications, so that his mind will clear and he can engage in legal work, among other things.

15. Without the medications, however, Mr. Lowe begins to hear voices in his head, telling him that he is being targeted, followed, persecuted, and that he must escape or fight back.

16. Even taking his medications, Mr. Lowe suffers from depression and anxiety and regularly experiences panic attacks.

Solitary Confinement Exacerbates Mr. Lowe's Mental Illness

17. Mr. Lowe's conditions are made substantially worse by his being confined in isolation for so many years.

18. Courts around the country, including the Fourth Circuit Court of Appeals and the United States Supreme Court, have recognized the serious harm that can be caused to an individual by being kept in prolonged isolation. Such harm is even more extensive when the individual has serious mental illness. *See, e.g.*, *Thorpe v. Clarke*, 37 F.4th 926, 936 (4th Cir. 2022) ("As far back as 1890, the Supreme Court recognized that prisoners subjected to such confinement exhibited a 'semi-fatuous condition' and 'violent insanity' and even died by suicide.", citing *In re Medley*, 134 U. S. 160, 172, 10 S. Ct. 384, 33 L. Ed. 835 (1890)); *see also Porter v. Clarke*, 923 F.3d 348, 357 (4th Cir. 2019) ("Of particular relevance, several courts have found—based on the empirical evidence set forth above—that solitary confinement poses an objective risk of serious psychological and emotional harm to inmates, and therefore can violate the Eighth Amendment", citing *Palakovic v. Wetzel*, 854 F.3d 209, 225-26 (3d Cir. 2017) ("acknowledg[ing] the robust body of legal and scientific authority recognizing the devastating mental health consequences caused by long-term isolation in solitary confinement"); *Ashker v. Brown*, No. C 09-5796, 2013 U.S. Dist. LEXIS 51148, 2013 WL 1435148, at *4-5 (N.D. Cal. Apr. 9, 2013); *Wilkerson v. Stalder*, 639 F. Supp. 2d 654, 678-79 (M.D. La. 2007) ("it is obvious that being housed in isolation in a tiny cell for 23 hours a day for over three decades results in serious deprivations of basic human needs.");

*McClary v. Kelly*, 4 F. Supp. 2d 195, 208 (W.D.N.Y. 1998) ("[T]hat prolonged isolation from social and environmental stimulation increases the risk of developing mental illness does not strike this Court as rocket science.")).

19. Mr. Lowe is locked alone in a six by ten foot cell for 23-24 hours a day.[1] During the one hour out of the cell—which he does not always receive—Mr. Lowe is allowed to shower or go outside into a small cage for "fresh air." The cage is located under a walled shelter which has small holes cut into the sides with screens over them; thus even when outside, Mr. Lowe gets no direct sunshine and cannot engage in meaningful exercise, as the cage is the equivalent size to his cell. Moreover, the opportunity to leave his cell is frequently offered late at night, when it is cold and dark outside.

20. Even when out for his one hour of "recreation," Mr. Lowe is not permitted to engage with other inmates or otherwise socialize.

21. Mr. Lowe has recently started to refuse to leave his cell when offered, because leaving his cell for "recreation" or a shower involves Mr. Lowe having to display his genitals and spread his buttocks for an officer to view; this is humiliating and degrading, and Mr. Lowe is tired of having to do this in order to shower.

Defendants Are Aware of Mr. Lowe's Mental Health Needs

22. Defendants are aware that Mr. Lowe has a history of self-harm, including prior suicide attempts.

23. For example, Defendants are aware that in January 2023, Mr. Lowe experienced what he describes as a psychotic break, in which he attempted suicide and used a razor to slice

---

[1] Until recently, Mr. Lowe was also allowed out of his cell for approximately one hour a day to perform janitorial work on his pod. This privilege has been revoked as punishment for his suicide attempt.

open his arm, face, top of his head, and genitalia. Mr. Lowe's self-harm was documented by Defendants.

24. Defendants are aware that Mr. Lowe regularly reports hearing voices in his head.

25. Throughout his nearly thirteen years of solitary confinement, Mr. Lowe has repeatedly informed Defendants of the detrimental effects that being in long-term solitary confinement was posing to his mental health.

26. Defendants are well-aware that Mr. Lowe is struggling; Mr. Lowe has requested relief from these conditions many, many times: he has filed countless written requests, written grievances, made verbal requests, and even filed lawsuits documenting his mental health struggles, his self-harm, his need for better mental health treatment, and his request to be removed from permanent solitary confinement.

27. Despite his pleas for help and clear need for more substantial mental health treatment, Mr. Lowe has not been placed in a clinical unit designed for care, instead remaining housed on a segregation unit that lacks appropriate clinical engagement and therapeutic programming.

Defendants Ignore Obvious Need for Mental Health Treatment

28. In January 2025, Mr. Lowe met with Dr. Thistlethwaite, his psychiatrist through PsiMed, the DCR contractor for mental health care.  At that time, he told Dr. Thistlethwaite that he was "doing fair" and that his mood was "OK, it keeps me from going over the edge I guess, keeps me from killing myself."

29. Per policy, Dr. Thistlethwaite scheduled a three month follow up with Mr. Lowe.

30. On February 5, 2025, Mr. Lowe met with a PsiMed therapist who performed a suicide risk assessment. The notes from that assessment indicate that "Inmate states that he always

thinks about harming himself but has no intent or plan to do so at this time. He states that if he did have a plan he wouldn't tell us."

31. When asked about suicidal thoughts, Mr. Lowe reported that "he stays depressed, states that he always has the thought but has no plan or intention to act."

32. The therapist further reported that "[d]uring conversation inmate appeared to be agitated, ruminated about his housing situation, & overall situation in general. Inmate voiced being depressed, stated that Mental Health doesn't help him. Inmate was difficult to engage with and would not discuss anything other than negative thoughts. Inmate reports losing [sic] at least 30 pounds due to not being able to eat the food at the facility. Inmate did state that he is drinking and eating commissary at times."

33. The evaluation then noted that Mr. Lowe had the following acute risk factors:

 a. Hopelessness/worthlessness/helplessness

 b. Severe depression or anxiety

 c. Agitation/Demanding/Argumentative/Hostile

 d. Homicidal ideation

 e. Highly impulsive behavior

 f. Negative view of future

 g. Perceived burden on family or others

34. The only follow up item tasked following this assessment, was to "see when next scheduled psych appointment is scheduled."

35. On March 29, 2025, Mr. Lowe refused to take some of his medications, including medications for his psychiatric conditions and seizure disorder (Keppra, Risperdal, Artane). Mr. Lowe believes these three medications give him particularly problematic side effects.

36. On that same day, Mr. Lowe began having panic attacks.

37. On or about March 29, 2025, Mr. Lowe asked to be able to meet with his PsiMed therapist. His request was denied.

38. Over the next several days, Mr. Lowe continued to experience panic attacks and repeatedly asked to meet with his therapist. The requests were ignored or denied.

39. Notably, Mr. Lowe's regular psychiatric appointment had been scheduled for April 6, 2025. For unknown reasons, on April 2, 2025—even as Mr. Lowe was decompensating and begging to meet with his therapist—that appointment was rescheduled to April 8, 2025.

40. On or about April 3, 2025, after Mr. Lowe again asked to meet with his therapist, stressing how important it was, he was told that his therapist would meet with him the following day, Friday, April 4, 2025.

41. On Friday, April 4, 2025, Mr. Lowe's therapist informed him that they would not be able to meet after all, because prison administrators had informed her that they were "short-staffed" and could not accommodate the request.

Mr. Lowe's Very Recent Suicide Attempt

42. On Sunday, April 6, 2025, Mr. Lowe attempted suicide by overdose at approximately 1:45 p.m.

43. About an hour later, a nurse and two officers who were passing out medication in the Quilliams II unit discovered the unconscious Mr. Lowe in his cell.

44. Specifically, after Mr. Lowe did not respond to knocks on his cell door, the nurse looked through the window and saw Mr. Lowe in a slumped position.

45. The nurse noted that "he wasn't really breathing" and asked to be let into the cell. Upon entry, the nurse found Mr. Lowe unresponsive and noted that his breathing was very slow

and shallow. Mr. Lowe did not respond to a sternum rub, his lips were cyanotic, and respirations were approximately 10.

46. The staff then called medical and administered Narcan twice to Mr. Lowe. Upon reviving, Mr. Lowe admitted that he had taken the drugs in an attempt to commit suicide.

47. Mr. Lowe was placed on oxygen and transported to Montgomery General Hospital, in Raleigh County, West Virginia, but returned to MOCC without being seen by a physician.

Placement on Suicide Watch

48. Following this event, Mr. Lowe was placed on Level 1, or constant, suicide watch in the MOCC medical unit.

49. The next day, April 7, 2025, a PsiMed employee met with Mr. Lowe to do a suicide risk assessment. The notes from that assessment show that Mr. Lowe told the employee that "he got any pills he could get from other inmates in the pod, then took them all to go to sleep. Inmate states that at the time he overdosed on pill he was suicidal."

50. The PsiMed therapist further recorded that Mr. Lowe, when asked if he currently wished he were dead or wished he could go to sleep and not wake up, stated, "Yes, I wish I could go to sleep and not wake up."

51. The therapist noted that his reported mood was anxious and agitated, and his observed mood was irritable. His stream of thought was "rambling."

52. Following this review, she reduced Mr. Lowe's status to suicide watch Level II, which requires that the individual be observed at least every fifteen minutes.

53. Upon information and belief, on April 8, 2025, less than two days after Mr. Lowe almost killed himself, PsiMed employee Eric Shrewsberry removed Mr. Lowe from suicide watch Level II, and Mr. Lowe was returned to his segregation cell.

54. Upon information and belief, once back on segregation, Mr. Lowe was continued on a lessened suicide watch.

55. That same day, Dr. Thistlethwaite met with Mr. Lowe for his regular three month check-up. When Mr. Lowe tried to tell Dr. Thistlethwaite that he was struggling with impulsivity, which Mr. Lowe believes contributed to his suicide attempt, Defendant Thistlethwaite told Mr. Lowe that he was only there to discuss medications, not other mental health concerns.

56. In his notes from that visit, Dr. Thistlethwaite noted that Mr. Lowe's affect was "blunted," that he had "retrogressed," and he increased Mr. Lowe's dosage of Risperdal. He made no mention of therapy for Mr. Lowe, or any other types of mental health interventions, such as moving him to the MOCC mental health unit.

57. Mr. Lowe's placement on suicide watch was discontinued several days later.

58. His current placement in segregation lacks direct visibility into his cell and does not allow for continuous observation.

59. Since being returned to the segregation unit, Mr. Lowe has continued to feel hopeless and depressed and continues to have panic attacks. He has begged to meet with his PsiMed therapist.

60. About a week after his suicide attempt, after begging to meet with someone from mental health, a PsiMed employee came down and asked if he was suicidal. Mr. Lowe said he was not but that he was experiencing really bad panic attacks and needed to talk with someone. The PsiMed employee then chastised Mr. Lowe, saying "you brought me all the way down here just for that?" and "don't you know panic attacks won't kill you?"

61. Upon information and belief, Mr. Lowe was scheduled for a mental health appointment with his PsiMed therapist on Friday, April 11, 2025.

62. Once again, however, the Defendants cancelled the appointment due to allegedly not having enough staff.

Punishment for Suicide Attempt Exacerbates Mental Health Concerns

63. As a result of Mr. Lowe's severe mental health crises resulting in attempted suicide, he has been punished by Defendants.

64. On April 6, 2025, the day of the attempted suicide, a member of the nursing staff filled out a "Inmate Health Services Request Form" on Mr. Lowe's behalf, stating that he needed assistance with an "overdose" and charging him three dollars—what inmates are charged when they request medical assistance.

65. As a result of the overdose, Mr. Lowe was issued two disciplinary reports, charging him with use and possession of drugs.

66. Mr. Lowe did not have a timely hearing on the allegations, as required by MOCC and DCR policy 325.00, and due process.

67. Nevertheless, Defendants removed all of Mr. Lowe's "privileges," as punishment for his severe mental illness. Specifically, Defendants took Mr. Lowe's TV, headphones, and radio from his cell, and are not allowing Mr. Lowe to order food through the prison commissary. Defendants have also fired Mr. Lowe from his prison job of being the Pod Janitor for his segregation unit.

68. Upon information and belief, Defendants' reliance on alleged "staffing concerns" is a pretext to deny Mr. Lowe necessary mental health treatment; thus, Defendants are withholding mental health treatment as another form of punishment.

69. As a result of Defendants' punitive actions, Mr. Lowe's depression and anxiety has worsened, as have his panic attacks.

70. Mr. Lowe is in danger of attempting suicide again and requires immediate access to mental health treatment and changes to the condition of his confinement.

<u>WVDHF Interferes with DCR's Ability to Effectuate this Court's Order</u>

71. On May 23, 2025, following a hearing on Plaintiff's emergency motion for injunctive relief, this Court entered an order directing Defendants Frame and Yardley to transfer Mr. Lowe to an inpatient psychiatric hospital in the state.

72. Upon information and belief, as stated by counsel for the WVDHF to this Court during a status conference on June 5, 2025, WVDHF has refused to accept the transfer and commitment of Mr. Lowe at any of its facilities.

73. Upon information and belief, WVDHF's refusal is based upon representations made by Defendants Frame and/or Yardley, regarding Mr. Lowe. Upon information and belief, these representations were made in private, without Mr. Lowe or counsel for Mr. Lowe having the opportunity to refute or rebut the representations.

74. Upon information and belief, as a result of these representations, WVDHF decided, prior to the civil commitment hearing of Mr. Lowe, to refuse to accept Mr. Lowe for treatment, and counsel for WVDHF attended the civil commitment hearing and argued against his commitment, despite the uncontroverted evidence that Mr. Lowe is suicidal and in desperate need of inpatient treatment.

75. As a result of WVDHF's refusal to accept Mr. Lowe for treatment, Mr. Lowe continues to be housed in conditions amounting to solitary confinement, and continues to deteriorate without access to the treatment he needs.

**COUNT I**
**VIOLATIONS OF THE UNITED STATES CONSTITUTION**
**DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEED**
**(42 U.S.C. § 1983)**

76. Plaintiff hereby incorporates and re-alleges, by reference, the allegations of the previous paragraphs of this complaint.

77. Defendants, while acting under the color of law, have—and continue to—violate Mr. Lowe's Eighth Amendment right to be free from cruel and unusual punishment by acting with deliberate indifference to his serious medical needs.

78. Specifically, Defendants have violated Mr. Lowe's federal constitutional rights, as described and identified here, by authorizing, committing, condoning, or failing to remedy their deliberate indifference to Plaintiff's serious mental health needs while housing him in segregation at MOCC.

79. As described herein, Defendants are aware that Mr. Lowe faces a substantial risk of serious harm if he is not provided with necessary mental health treatment.

80. Defendants are acting with deliberate indifference to the rights of Mr. Lowe, who requires meaningful mental health treatment to prevent another suicide attempt.

81. Accordingly, the Defendants' conduct as alleged in the Complaint violates the Eighth Amendment to the United States Constitution.

### COUNT II
### VIOLATIONS OF THE UNITED STATES CONSTITUTION
### VIOLATION OF DUE PROCESS RIGHTS
### (42 U.S.C. § 1983)

82. Plaintiff hereby incorporates and re-alleges, by reference, the allegations of the previous paragraphs of this complaint.

83. Under the Fifth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, no person . . . shall . . . be deprived of life, liberty, or property, without due process of law. . . ." U.S. Const. Amnd. V.

84. Under West Virginia state law, upon entry of an order finding probable cause that an individual is likely to deteriorate without clinically necessary treatment and/or likely to cause serious harm to himself as a result of mental illness, *see* W. Va. Code § 27-5-2, the person is to be examined and treated in a mental health facility. W. Va. Code § 27-5-3.

85. On June 2, 2025, a hearing was conducted pursuant to West Virginia Code § 27-5-2, and the mental hygiene commissioner found probable cause to believe that that Mr. Lowe will attempt to kill himself again, and further, that due to Mr. Lowe's mental illness, it is likely that deterioration will occur without clinically necessary treatment.

86. Pursuant to West Virginia Code § 27-5-3, upon such finding, Mr. Lowe should have been admitted to a state psychiatric hospital for further evaluation and treatment.

87. Defendants interfered with Mr. Lowe's ability to obtain treatment, however, by blocking his transfer without due process. Specifically, WVDHF is refusing to accept Mr. Lowe into their forensic unit for further evaluation and treatment as a result of discussions between the Defendants that occurred prior to the probable cause hearing.

88. WVDHF's refusal to accept Mr. Lowe for treatment on the basis of off-the-record representations made by WVDCR Defendants, without giving Mr. Lowe the opportunity to refute or rebut such representations, is arbitrary and capricious, and denies Mr. Lowe's procedural due process rights under the Fifth Amendment of the United States Constitution.

89. Here, the Defendants, who are all acting under the color of law, know that Mr. Lowe will likely attempt suicide again in the absence of necessary treatment, but are refusing such treatment, thereby denying Mr. Lowe the benefits otherwise accorded to him under West Virginia law, and further deprives him of his liberty, and threatens to deprive him of his life, all of which violates his substantive due process rights.

90. In this context, the denial of liberty is not in reference to removal from incarceration but rather refers to state action that is denying Mr. Lowe the liberty that all people have to live to the fullest extent possible subject to their individual circumstances. In other words, Mr. Lowe remains subject to a prison sentence of life without parole, but maintains a liberty interest in not dying prematurely as a result of arbitrary and capricious state action.

**WHEREFORE**, the Plaintiff respectfully requests that the Court enter an order awarding the following relief:

(a) A declaration that Defendants are violating Mr. Lowe's constitutional rights by acting with deliberate indifference to his serious medical needs;

(b) A declaration that Defendants are violating Mr. Lowe's constitutional rights by violating his Fifth Amendment right to due process;

(c) An injunction requiring Defendants to transfer and accept Mr. Lowe into a state psychiatric facility for treatment and stabilization, until such time as he is no longer suicidal;

(d) An injunction requiring WVDCR Defendants to provide appropriate mental health care to Mr. Lowe upon his return to WVDCR custody, including but not limited to continuing him on any medication regime implemented by the psychiatric facility; and providing access to, including necessary staffing for, frequent, regular therapy sessions with a qualified mental health provider;

(e) An injunction forbidding WVDCR Defendants from continuing to house Mr. Lowe in a segregation unit;

(f) An injunction ordering WVDCR Defendants to return Mr. Lowe's personal possessions, including his TV, radio, and headphones, and restore his access to commissary upon his return to MOCC;

      (g)      An injunction ordering Defendants to provide Mr. Lowe with outdoor recreation in a location that permits Mr. Lowe to actually receive sunshine and engage in exercise;

      (h)      Attorney's fees and costs, pursuant to 42 U.S.C. § 1988; and

      (i)      Any other equitable relief that this Court deems appropriate.

      Respectfully submitted,
**KEITH LOWE,**
**By Counsel,**

/s/ Lydia C. Milnes
Lydia C. Milnes (WVSB #10598)
Lesley M. Nash (WVSB #14158)
Mountain State Justice, Inc.
1029 University Ave., Suite 101
Morgantown, WV 26505
(304) 326-0188
(304) 326-0189 (facsimile)
*lydia@msjlaw.org*