IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

KEITH LOWE,

                Plaintiff,

v.                                                  CIVIL ACTION NO.   2:25-cv-00272

SUPERINTENDENT JOHN FRAME, et al.,

                Defendants.


MEMORANDUM OPINION AND ORDER

On May 23, 2025, this Court ordered that plaintiff Keith Lowe ("Plaintiff")–an inmate at Mount Olive Correctional Complex ("Mount Olive")–be transferred "to a state psychiatric facility" because of, *inter alia*, a recent suicide attempt.   (*See* ECF No. 40.)   That transfer has never occurred.

Pending before the Court is plaintiff Keith Lowe's ("Plaintiff") Motion to Enforce the Preliminary Injunction, Hold the Defendants in Civil Contempt, and Impose Sanctions.   (ECF No. 97.)   For the reasons that follow, the Court **GRANTS** the motion and **FINDS** that defendants John Frame and Michael Caruso ("Defendants") are in contempt of this Court's order.

*I.*      *BACKGROUND*

On May 23, 2025, this Court issued its order granting, in part, Plaintiff's motion for a preliminary injunction.[1]   (*See* ECF No. 40.)   In that order, this Court "require[d] Defendants to

---

[1] The general background of this case, including the alleged rationale for keeping Plaintiff in solitary confinement for over twelve years, can be found in that order.

effectuate [Plaintiff's] transfer to a state psychiatric facility," ordering that "Defendants [Kelly and Frame] accomplish this **FORTHWITH**."  (*Id.* at 26.)   It is now late August and Plaintiff remains at Mount Olive.

How did this happen?   On May 27, 2025, Defendant Lowe claims he received the order granting the preliminary injunction.[2]   Despite its clarity, the order was apparently confusing to Defendants and other members of WVDCR.   Defendant Frame and others within WVDCR attempted to seek clarity by asking each other what this Court's order meant for them.   At no point was this Court made aware of Defendants' purported confusion.

Ultimately, the WVDCR Defendants–on their own–decided that the order only required them to file a petition under W. Va. Code § 27-5-2 to have Plaintiff involuntarily committed. Defendant Frame filed that petition for commitment on May 27, 2025.   In that application, Defendant Frame noted that he was "ordered by Judge Johnston to file [the] application."   (ECF No. 69 at 4.)   Defendant Frame also filed an "institutional record" to show "the threat to security that [Plaintiff] is capable of."   (ECF No. 69-2 at 2.)   The record appears to be the same one filed with this Court during the original preliminary injunction proceedings.

On May 29, 2025, Defendant Frame made the decision to move Plaintiff from solitary confinement to Mount Olive's Mental Health Unit.   Ostensibly, Defendant Frame made the move after discovering new information that made him believe that Plaintiff was at risk of attempting suicide again.[3]   Plaintiff testified that his conditions within the Mental Health Unit generally tracked those of the solitary confinement in which he was previously held.   Defendants did not

---

[2] Unless otherwise cited, the facts were developed during the August 4, 2025, hearing on the pending Motion.
[3] Of course, that is also what Plaintiff and his undisputed expert stated on May 14, 2025 at the preliminary injunction hearing.   It is also what this Court told Defendant Frame in the May 23, 2025, order.  (*See* ECF No. 40.)

refute that characterization, except to say that he was receiving more mental health treatment in his new confinement.

A probable cause hearing on Plaintiff's involuntary commitment was held on May 30, 2025, in Fayette County before Mental Hygiene Commissioner Evan Dove.[4]   Defendant Frame appeared at the hearing by video.   Gail Lipscomb, an Assistant Attorney General, was also present at the hearing.   Apparently, it was unclear to pretty much everyone what Attorney Lipscomb was doing at this hearing.   Attorney Lipscomb claimed that she "appeared at the probable cause hearing" on behalf of Sharpe Hospital and the West Virginia Department of Health Facilities ("WVDHF").[5]   (*See* ECF No. 85-2 at 4.)   Defendant Frame largely corroborated that claim at the contempt hearing, stating that he knew Attorney Lipscomb was present but did not know if she was representing him.[6]   However, Commissioner Dove believed Attorney Lipscomb was representing Defendant Frame.   This confusion on his part was corroborated by the fact that Commissioner Dove repeatedly referred to Attorney Lipscomb as counsel for the applicant, Defendant Frame, during the probable cause hearing.   (*See generally* ECF No. 91-4.)   At no point did Defendant or Attorney Lipscomb object to that characterization.

During the hearing, Plaintiff made an appearance through a state public defender[7] and was present virtually.   Through that counsel, he represented to Commissioner Dove that he wished to

---

[4] A recording of the probable cause hearing was made in lieu of an official transcript.   That recording, along with a recording of the final commitment hearing, was provided to all parties and this Court.   (*See* ECF No. 91-4.)   For purposes of this order, this Court is relying on that recording and makes citation to the time stamp when necessary.

[5] Notably, neither WVDHF nor Sharpe Hospital appeared in this case prior to entry of the preliminary injunction.   Nor is it apparent that either entity was required under West Virginia law to make such an appearance.   In other words, there really does not seem to be a point for either entity to appear by counsel at the probable cause hearing other than their attempt to prevent Plaintiff from being admitted to any mental health facility.

[6] Defendant Frame has been represented by Assistant Attorney General Jonathon Calhoun in these proceedings.

[7] For unknown reasons, Plaintiff's attorneys in this matter were not selected to represent Plaintiff at the probable cause hearing.

waive the hearing so that he could be committed.  Contrary to the nature of an involuntary commitment, Plaintiff wanted to be committed.  (*See* ECF No. 91-4 at 00:04:30.)  Attorney Lipscomb represented to Commissioner Dove that "we wish to have a hearing" so that they could "challenge any involuntary commitment outside of Mount Olive."  (*Id.* at 00:09:50.)  Based on that representation, Commissioner Dove proceeded to hold a hearing on the petition.[8]

Commissioner Dove heard testimony at the probable cause hearing.  The first testimony came from the mental health certifier–a non-party mental health professional who assesses a respondent's mental state and makes recommendations to the mental hygiene commissioner.  The certifier testified that she had some reservations about the manner in which this Court made findings as to Plaintiff's mental state.  Regardless of those reservations, the certifier concluded that Plaintiff's recent suicide, coupled with being kept in constant solitary confinement, elevated the risk that Plaintiff would attempt suicide again.  (*See id.* at 00:30:45.)

During examination, Plaintiff's counsel asked only three questions to the mental health certifier: Did Plaintiff currently experience suicidal ideation? Did Plaintiff currently express suicidal intent? Did Plaintiff have a plan in place to attempt that suicide?  The mental health certifier answered yes to all three questions.  (*Id.* at 00:35:15–36:00.)

By contrast, Attorney Lipscomb's examination went on for about nineteen minutes.  Throughout the questioning, Attorney Lipscomb attempted to portray Mount Olive as adequately treating Plaintiff.[9]  Further, Attorney Lipscomb posed her questions in a manner to characterize

---

[8] As Commissioner Dove would later describe, the hearing placed Plaintiff and Defendant Frame in "reverse roles"— where Plaintiff, as respondent, wished to be committed and Defendant Frame, as the applicant, wished to have his own application denied.  (*See* ECF No. 92-4 at 01:42:30.)

[9] Ironically, one of the questions posed to the mental health certifier was if the Defendants' treatment plan would adequately address Plaintiff's outstanding suicidal ideation.  The certifier seemed more inclined to believe that the plan was inadequate.  (*See* ECF No. 92-4 at 00:50:30.)

the circumstances of Plaintiff's condition of confinement as that of his own making and that Plaintiff's own statements should be discredited. (*See id.* at 00:36:15–55:00.) Through the testimony, it was apparent that Defendants were trying to develop a record that Mount Olive "showed a willingness" to provide adequate care for Plaintiff, even if it was "not adequate" at the moment. (*Id.* at 00:54:30.)

Following the examination of the mental health certifier, Defendant Frame was given the opportunity to call his own witnesses. At that time, Defendant Frame called himself to the stand through Attorney Lipscomb. (*See id.* at 00:56:15 (Commissioner Dove: "I would ask as far as the applicant is concerned, and obviously he is represented by counsel, Ms. Lipscomb do you have any exhibits or witnesses you intend to call in this matter?").) Some of his testimony was simply informative about the involuntary commitment process for incarcerated individuals. Other testimony was not. Defendant Frame characterized this Court's order as requiring him to "follow the state code that pertains to me and file that paperwork." (ECF No. 91-4 at 01:10:00.) He also attempted to characterize the treatment at Mount Olive as adequate despite this Court's finding to the contrary. (*Id.* at 01:12:15.) According to Defendant Frame, Mount Olive provided Plaintiff with a "completely new setting" by moving him from solitary confinement in Quilliams II to solitary confinement in the Mental Health Unit, thus preventing the "deterioration" of his mental health. (*Id.*) Finally, Defendant Frame testified, just as he did during the preliminary injunction hearing, that Plaintiff poses a security threat. (*Id.* at 01:16:00.)

In closing arguments on behalf of Defendant Frame, Attorney Lipscomb stated that Mount Olive can adequately treat Plaintiff. Despite the fact that this Court found Mount Olive incapable of treating Plaintiff, Attorney Lipscomb invited Commissioner Dove to make a finding that Mount

Olive was capable of providing treatment for Plaintiff.   (*Id.* at 01:41:14.)   Accordingly, Attorney Lipscomb asked Commissioner Dove not to commit Plaintiff.   (*Id.*)

Remarkably, Defendants were not successful in opposing their own petition.   They were, however, successful in persuading Commissioner Dove to issue an order that kept Plaintiff from being moved from Mount Olive.   In his written order, Commissioner Dove noted the "extremely violent and unique character of [Plaintiff]" as a basis to conclude that Sharpe Hospital did not have adequate resources to meet "the security needs of [Plaintiff]."   (ECF No. 91-3 at 7.)   Despite finding Plaintiff needed to be committed, Commissioner Dove created an exception to immediate commitment at a state facility.   Defendants were given two weeks to find a facility for placement and, if that state facility "determine[d] that treatment can take place virtually" at Mount Olive, then "transport of [Plaintiff] to a facility outside of [Mount Olive] <u>shall not be required</u>."   (*Id.* (emphasis original).)   In light of that order, Defendants continued to house Plaintiff at Mount Olive in the Mental Health Unit.

Following the probable cause hearing, it became apparent to Plaintiff's counsel in this case that something was amiss.   Both they and counsel for the WVDCR Defendants requested an emergency status conference.   On June 5, 2025, this Court held that conference.   Attorney Lipscomb–while not making a formal appearance in the case–was present on that call claiming to represent non-party Sharpe Hospital.   Although they did not yet have the recording of the proceeding, Plaintiff's attorneys claimed that Defendant Frame and WVDHF actively opposed Plaintiff's transfer to a state psychiatric facility.   Attorney Lipscomb—the only person on the call who was present at the probable cause hearing—denied that accusation.   Instead, she stated that state procedures somehow prevented Plaintiff's admission into the facility.   She left this Court

with the impression that Plaintiff needed to be evaluated by Sharpe Hospital in order to be admitted, and that such evaluation could not occur because he was not admitted into Sharpe Hospital.   Logically, this was somewhere between a conundrum and a studied impossibility.   At no point did Attorney Lipscomb state what actually happened at the probable cause hearing.

After the status conference, Plaintiff successfully moved for joinder of Defendant Caruso. (*See* ECF No. 65.)   Importantly, Plaintiff also successfully moved to have the records of the probable cause hearing made part of this record.   (*See* ECF Nos. 68, 80.)

However, Plaintiff was unsuccessful in getting Commissioner Dove to commit him to Sharpe Hospital.   Following the final commitment hearing on June 30, 2025, Commissioner Dove found that Plaintiff's treatment at Mount Olive "has not solved his suicidal ideations."   (ECF No. 85-13 at 4.)   Yet he also found that, "[d]ue to the dangerous nature of [Plaintiff], transport will be delayed until a suitable treatment facility is located."   (*Id.*)   Despite Commissioner Dove expecting an update on location within "2 weeks," (*id.*), Plaintiff remained, and continues to remain, at Mount Olive to this day.

Following the final commitment order, Defendants attempted to transfer Plaintiff to a federal medical facility in Missouri.[10]   (ECF No. 82-2 at 2.)   The effort seemed to have been initiated at some point between July 7 and July 15, 2025.   (*Id.* at 3.)   Plaintiff was finally approved around July 22, 2025.   (*Id.*)   That transfer is expected to occur around September 10, 2025.[11]   (*Id.*)

---

[10] Defendants claim that they first attempted to move Plaintiff to a facility in South Carolina, but the details of that effort are not explained beyond that "the facility did not and has still not accepted the Plaintiff for placement."   (*See* ECF No. 82-2 at 2.)

[11] Plaintiff filed the pending Motion on July 23, but Defendants did not provide any update to him or this Court about the Missouri facility until after the Motion was filed.   (ECF No. 82-2 at 3 n.5.)

7

The delay in transfer, however, came at a cost. On July 7, 2025, Plaintiff attempted suicide by cutting himself with a dull razor. (*See* ECF Nos. 97-3, 97-4.) According to Defendant Frame, Mount Olive failed to place a razor restriction on Plaintiff when he was moved from solitary confinement to the Mental Health Unit. Mystifying.

On July 24, 2025, Plaintiff finally filed this Motion, asking this Court to enforce the preliminary injunction, find Defendants in civil contempt, and issue sanctions if appropriate. (ECF No. 97.) Defendants timely filed their responses to the Motion. (ECF Nos. 82-2, 85-2.) This Court held a hearing on August 4, 2025. Accordingly, the matter is now ripe for this Court's adjudication.

## II.    LEGAL STANDARD

Civil contempt is assessed under a burden shifting framework. *Consumer Fin. Prot. Bureau v. Klopp*, 957 F.3d 454, 462 (4th Cir. 2020). The party seeking contempt must first prove, by clear and convincing evidence, four elements: (1) that the alleged contemnor had knowledge of an existing, valid order of the Court; (2) that the order was in favor of the party seeking contempt; (3) "that the alleged contemnor by [his] conduct violated the terms of the decree, and had knowledge . . . of such violations"; and (4) that the party seeking contempt suffered harm as a result. *De Simone v. VSL Pharms., Inc.*, 36 F.4th 518, 529 (4th Cir. 2022) (citing *Ashcroft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000)). If that showing is made, the burden shifts to the alleged contemnor to show that they made, "in good faith[,] all reasonable efforts to comply with the decree." *Id.* (citing *United States v. Ali*, 874 F.3d 825, 831 (4th Cir. 2017)).

### III.    ANALYSIS

In his Motion, Plaintiff claims that Defendant Caruso was bound by this order despite only being formally joined to this litigation on July 22, 2025.  He further claims that, through their conduct, all Defendants have failed to abide by this order.   Accordingly, Plaintiff asks this Court to find the Defendants have committed civil contempt and compensate him accordingly.   This Court will address each of these issues in turn, as well as the conduct of counsel.

#### A.  Secretary Caruso and WVDHF were bound by the preliminary injunction

Plaintiff asks this Court to find Defendant Caruso in contempt for violating the preliminary injunction.   He claims that Defendant Caruso and WVDHF were in "active concert or participation" with Defendant Frame, thereby making the order applicable to Defendant Caruso even though he and WVDHF were not originally named parties when the preliminary injunction was entered.   (*See* ECF No. 97 at 8.)   The Court agrees.

Federal Rule of Civil Procedure 65 dictates who is bound by a preliminary injunction.   The parties, as well as their "officers, agents, servants, employees, and attorneys" are obviously bound. Fed. R. Civ. P. 65(d)(2)(A)–(B).   As applicable here, non-parties may also be bound if the non-party is "in active concert or participation with anyone" who is bound by the preliminary injunction.  Fed. R. Civ. P. 65(d)(2)(C).   An entity is considered in active concert or participation with a bound party "if a nonparty aids or abets an enjoined party in violating an injunction, or when a nonparty is 'in privity' with an enjoined party."  *See Bone v. Univ. of North Carolina Health Care Sys.*, 678 F. Supp. 3d 660, 710 n.37 (M.D.N.C. 2023).   For purposes of contempt, a court may exercise jurisdiction over non-parties "who, with knowledge of the court's orders, actively aid and abet an enjoined party" in the violation of that order.  *See Waffenschmidt v.*

9

*MacKay*, 763 F.2d 711, 718–19 (5th Cir. 1985); *but see Hawkins v. i-TV Digitals Tavkozlesi zrt.*, 935 F.3d 211, 228 (4th Cir. 2019) (limiting *Waffenschmidt* from extending contempt jurisdiction over foreign entities).

Under this standard, WVDHF was bound by the preliminary injunction as acting in active concert and participation.   It is clear that WVDHF had actual knowledge of the order.   Attorney Lipscomb frequently referenced the order throughout the probable cause hearing.   As just one example, Attorney Lipscomb stated that, although this Court had "opined" about Mount Olive's inability to adequately treat Plaintiff, Commissioner Dove should feel encouraged to make an alternative finding because "its [his] courtroom" and he "cannot be ordered" by this Court.   (*See, e.g.*, ECF No. 91-4 at 00:09:24.)

Further, WVDHF acted to aid and abet Defendants' violation of the preliminary injunction. Attorney Lipscomb indulged Defendant Frame in the charade that this Court's order only required him to file a petition to commit Plaintiff, but somehow gave him license to actively oppose that commitment order from being issued.   Attorney Lipscomb's appearance at the probable cause hearing was a blatant attempt to give plausible deniability to Defendant Frame.   By making the arguments she made alongside Defendant Frame, both he and WVDHF attempted to portray his own violations of the preliminary injunction as the independent actions of WVDHF.

WVDHF's claim that it did not abet the defiance of this Court's order is simply unavailing. In WVDHF's brief on the contempt motion, Attorney Lipscomb claims that WVDHF appeared at the probable cause hearing merely "to express its concerns with facility security."   (ECF No. 85-2 at 14.)   She also claimed WVDHF "took no position on whether probable cause [to commit

Plaintiff] should be issued."   (*Id.* at 5.)   That is a lie.[12]   The audio recording of the probable cause hearing makes clear that Attorney Lipscomb stated she was "asking the court to *not* involuntarily commit [Plaintiff]."   (ECF No. 91-4 at 01:41:15 (emphasis original).)   The representation went far beyond just expressing security concerns.   Rather, it was an attempt to paint Mount Olive as an adequate facility to treat Plaintiff.   (*See id.*)   In other words, Defendants attempted to use WVDHF and the involuntary commitment hearing to get a new finding from Commissioner Dove that contradicted this Court's order.   (*See* ECF No. 40 at 16.)

As the Supreme Court has made clear, binding certain non-parties to preliminary injunctions ensures that the bound defendants will "not nullify a decree by carrying out prohibited acts through aiders and abettors."   *Regal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9, 14 (1945).   This case presents a clear example of such an attempt.   It is clear that WVDHF inserted itself into the controversy and acted in a manner to ensure Defendants could violate this Court's order under the cover of legal process.   This Court will not be deceived by such tactics.   Defendant Caruso, and the WVDHF, were bound by this Court's preliminary injunction as being in "active concert" with the bound Defendants.   *See* Fed. R. Civ. P. 65(d)(2)(C).

Accordingly, this Court will proceed to analyze the violations of all Defendants, including Defendant Caruso.

### B.  Civil contempt

In their response to Plaintiff's motion, Defendants stipulated to the first two elements of civil contempt.   (*See* ECF No. 82-2 at 5.)   Thus, Plaintiff only needs to prove by clear and

---

[12] Notably, Lipscomb's brief in opposition to the contempt motion was filed the same day the recording of the probable cause hearing was made available to the parties, but a day before this Court received a copy of the recording.   Further, it was so provided by order of Magistrate Judge Aboulhosn after contested proceedings.

convincing evidence that the Defendants knowingly violated this Court's order and that he was harmed as a result of those violations.   After that, the burden shifts to Defendants, who must show that they acted in good faith to comply with the Court's order.   Each of these elements will be analyzed in turn.

      1.   <u>By their conduct, Defendants knew they violated the Court's order</u>

Much of the Defendants' transgressing conduct can be traced to the May 30, 2025, probable cause hearing.   In his brief–which was filed before the recording of the probable cause hearing was distributed–Plaintiff stated that "[u]pon information and belief, Defendant Frame and his counsel at the probable cause hearing both argued that Mr. Lowe was too dangerous to be housed at William R. Sharpe Psychiatric Hospital in West Virginia."   (ECF No. 97 at 4.)   Plaintiff made a similar argument at the status conference held on June 5, 2025.   At the contempt hearing on August 4, 2025, with the recording of the probable cause hearing in hand, Plaintiff made that assertion once again.   He argued at the contempt hearing that, in light of the recording, it is clear that Defendant Frame argued through Attorney Lipscomb that Plaintiff should be denied commitment to any facility outside of Mount Olive.

Defendants Frame and Caruso both deny that characterization.   Defendant Frame testified that he was not represented by Attorney Lipscomb at the probable cause hearing.   Instead, Defendant Frame simply stated that he only provided truthful testimony and "accurately conveyed the substance" of the Court's order before Commissioner Dove.   (ECF No. 82-2 at 8.)   Further, Defendant Caruso claims that Attorney Lipscomb, who now appears as his attorney, only expressed a concern for the security of Mount Olive.   (ECF No. 85-2 at 14.)   As they portray it, both Defendant Frame and WVDHF, through Attorney Lipscomb, did nothing to actively prevent

Plaintiff's admission into a state psychiatric facility.

The weight of the evidence simply does not support Defendants' assertion. First, it is apparent that Commissioner Dove was misled to believe Attorney Lipscomb was "counsel for the applicant [Defendant Frame]." (ECF No. 91-4 at 00:05:30; *see also id* at 00:56:20 (Commissioner Dove: ". . . as far as the applicant is concerned, and obviously he is represented by counsel, do you have any exhibits or witnesses you intend to present on this matter?").) That characterization was corroborated by Commissioner Dove's testimony at the contempt hearing where he stated that Attorney Lipscomb was counsel on behalf of Defendant Frame at the proceeding before him. Defendant Frame and Attorney Lipscomb had ample opportunity to advise Commissioner Dove of the true nature of Attorney Lipscomb's representation.[13] Their failure to do so appears to be a calculated strategy on their part to deceive both Commissioner Dove and this Court.

This distortion about the nature of Attorney Lipscomb's representation is important for this proceeding because it highlights the steps Defendant Frame took to circumvent this Court's order. Plaintiff expressly stated that he wished to waive the probable cause hearing altogether because he wanted to be committed per Defendant Frame's application. Defendant Frame and his counsel, however, were adamant that "we wish to have a hearing." (*Id.* at 00:10:00.) The only purpose of that request was for counsel to "challenge any involuntary commitment outside of Mount Olive." (*Id.* at 00:10:15.) Defendant Frame's counsel then acted in accordance with that plan. She cross-examined the mental health certifier, presented opening and closing arguments on behalf

---

[13] In fact, at one point Commissioner Dove seemed to directly inquire about Attorney Lipscomb's representation. During a portion where Attorney Lipscomb sought to proffer evidence about Sharpe Hospital, Commissioner Dove asked whether that proffer was "on the basis of representation of Mr. Frame or . . . legal representation of William R. Sharpe?" (ECF No. 91-4 at 01:32:20.) Attorney Lipscomb recognized that "those were two different things," but proceeded to hedge by saying that "their interests are aligned." (*Id.*) She could have simply denied representing Defendant Frame at that time. Her failure to do so speaks to the duplicitous nature of her representation at that hearing.

of Defendant Frame, and then called Defendant Frame as a witness.[14]

All of this was done to prevent "the transfer [of Plaintiff] to a state psychiatric facility . . .

**FORTHWITH**."  (*See* ECF No. 40 at 26.)   In effect, that is what Defendant's counsel achieved.

Because of Attorney Lipscomb's representations, Commissioner Dove stated at the probable cause

hearing that there was a path for "treatment to begin at Mount Olive," despite this Court's order to

the contrary.  (ECF No. 91-4 at 01:55:55.)   That sentiment was reflected in Commissioner

Dove's order, which stated that if "the Chief Medical Officer of [a facility that could viably admit

Plaintiff] determines that treatment can take place virtually, or with the assistance of staff in the

medical wing of [Mount Olive], then transport of [Plaintiff] to a facility outside of [Mount Olive]

<u>shall not be required</u>."  (ECF No 69-3 at 22 (emphasis in original).)   Put simply, Defendant

Frame and Attorney Lipscomb were able to get a ruling directly at odds with this Court's order

based on the representations made at the probable cause hearing.

In addition to his attorney's conduct, Defendant Frame also personally engaged in conduct

that violated the Court's order.   As Plaintiff established at the contempt hearing, Defendant Frame

testified at the probable cause hearing that Mount Olive was able to treat Plaintiff adequately and

that commitment should be denied.   Plaintiff contends that, by securing an order from

Commissioner Dove that contradicted this Court's order of commitment, Defendants violated the

preliminary injunction.

Defendants refute this.   They claim that "Defendant Frame [particularly] acted to carry

out the Court's preliminary injunction order to the extent of [his] ability to do so."  (ECF No. 82-

---

[14] Defendant Frame indicated at the contempt hearing that he was somehow under an obligation to testify at the probable cause hearing.  The fact that he, in effect, called himself as a witness to testify against treating Plaintiff anywhere but Mount Olive really undercuts that characterization.

2 at 6.)   That is because "Defendant Frame filed the mental hygiene petition . . . and the initial civil commitment was granted."   (*Id.*)   Thus, Defendant Frame apparently "exhausted the limits of his authority."   (*Id.* at 7.)

Defendants are wrong.   Plaintiff was granted that relief *despite* Defendant Frame's efforts, not because of them.   He did file a petition, and Plaintiff was granted some token relief. However, Defendant Frame conveniently ignores the part before and between those two events in which he sought to deny Plaintiff's admission to any facility other than Mount Olive.   Indeed, thus far he has succeeded, but not without consequence.

Defendant Frame did more than "just [provide] testimony."   (*See* ECF No. 82-2 at 8.)   He, and the other Defendants, took a deliberate course of action to get a state order that contradicted this Court's order.   In doing so, they have knowingly violated this Court's order.

2.   Plaintiff suffered harm as a result of Defendants' violations

Next, Plaintiff must show that he has suffered harm as a result of Defendants' violations of this Court's order.   To that end, Plaintiff states that the harm suffered includes remaining at Mount Olive "in conditions of confinement amounting to solitary confinement," which contributes to his deteriorating mental health.   (ECF No. 97 at 12.)   Because of that deteriorating mental health, Plaintiff avers that he "used a razor to harm himself, seeking to 'release the inside pain, outward.'"   (*Id.* (citing ECF No. 97-4 at 3).)

Defendants did not rebut Plaintiff's assertions.   Instead, they claim that the "fourth factor is moot" because "[n]o harm can result from a violation of the Court's order if there is no violation [under the third factor]."   (ECF No. 82-2 at 5.)

It is clear that Plaintiff was harmed as a result of Defendants' violation of the order. Because of Defendants' efforts to prevent Plaintiff's transfer to a state psychiatric facility, Plaintiff was kept at Mount Olive in the mental health unit. The mental health certifier indicated that Plaintiff's thoughts of suicide worsened in the time between the probable cause and final commitment hearings. (*See* ECF No. 69-4 at 48.) More alarming, however, is the fact that Plaintiff ultimately attempted suicide again following Plaintiff's final commitment. (*See* ECF No. 97-3.) All of this happened at Mount Olive, the very facility Defendant Frame contends will adequately protect and treat Plaintiff.[15]

Plaintiff states that the Court "entered a preliminary injunction . . . to prevent just the sort of harm which has occurred." (ECF No. 97 at 9.) He is correct. Plaintiff's continued confinement at Mount Olive in conditions which mirror his solitary confinement have clearly created the very harm the Court sought to avoid. (*See* ECF No. 40 at 20–21 (finding Plaintiff's confinement poses a substantial risk of irreparable harm because of his heightened risk of completing suicide).) The "treatment" provided by Defendants–developed without consulting Plaintiff's counsel or this Court–has done little to abate the concerns the Court had about Plaintiff remaining at Mount Olive. This harm could have been avoided if the Defendants abided by this Court's order. Their defiant choices have led to the harms Plaintiff experienced.

---

[15] Shockingly, Defendant Frame stated at the civil contempt hearing that Mount Olive staff neglected to place a razor restriction on Plaintiff when he was moved to the Mental Health Unit. That seems to fly in the face of the concerns for self-harm that prompted the move in the first place. This circumstance sinks Mount Olive's argument that it can properly treat Plaintiff, not least because the record developed at the preliminary injunction hearing indicated that Plaintiff previously attempted suicide ***with a razor***.

3. <u>Defendants did not act in good faith</u>

Since Plaintiff has met his burden, Defendants must now show that they acted in good faith to follow the Court's order. Based on the evidence, the Defendants have not demonstrated good faith.

Defendant Caruso claims WVDHF proceeded in good faith because it made "*all* reasonable efforts to locate an appropriate psychiatric treatment facility—and has now accomplished that task." (ECF No. 85-2 at 16 (emphasis original).) In fact, WVDHF did not seem at all interested in helping Plaintiff get into *any* facility other than Mount Olive at the probable cause hearing. It appears they sent their attorney to assist Defendant Frame in obtaining the order they truly wanted: keeping Plaintiff at Mount Olive until maybe Defendants find a facility they feel is appropriate. If Defendant Caruso, and WVDHF, felt they needed a stay of the Court's order, that motion could have been filed and entertained. Instead, they sought alternative relief from a state tribunal, advocated for an order contradicting this Court's order, and tried to run the clock out on the relief the Court granted Plaintiff. None of that can be characterized as a good faith execution of the Court's order.

Nor can Defendant Frame defend his actions as good faith. Again, Defendant Frame cites to the facts that Defendants "initiated mental hygiene proceedings," "moved Plaintiff . . . to the mental health unit," and "obtained acceptance of a referral to a federal medical facility" all as good faith on their part. (ECF No. 82-2 at 9.) Defendants fail to appreciate the consequences of failing to adhere to the Court's orders. Instead of complying, Defendant Frame sought to relitigate the preliminary injunction before a county mental hygiene commissioner. While Defendants did finally secure a placement at a federal facility, it was not until after months of delay, further

17

attempts to keep Plaintiff at Mount Olive, and another suicide attempt.

Defendant Frame also claims that he acted in good faith because he and WVDHF "worked to help facilitate the Plaintiff [to receive] additional psychiatric treatment via telehealth at Mt. Olive." (*See* ECF No. 82-2 at 8.)   It is directionally good to see that Defendants are finally taking some proactive steps to address Plaintiff's mental health issues.   However, it is troubling that it takes federal litigation to get that modicum of treatment for Plaintiff in the first place.   Regardless of Defendants' latest efforts to treat Plaintiff, it was not what the Court ordered.   Their efforts to earn themselves extra credit through these actions do little to address the real problem of actively thwarting the transfer of Plaintiff.

Any revisiting of the preliminary injunction should have been done before this Court, not before Commissioner Dove.   The result of Defendants' actions was to delay the implementation of the preliminary injunction.   The Court **FINDS** that such a delay is what Defendants ultimately wanted all along.   The Court cannot find that these actions amount to good faith.

Accordingly, the Court **FINDS** Defendants are in civil contempt.

4. <u>Contempt remedies</u>

The remedy for civil contempt is within the discretion of the Court.   *In re General Motors Corp.*, 61 F.3d 256, 259 (4th Cir. 1995).   The remedy afforded in civil contempt should be "remedial and compensatory and, unlike criminal contempt, nonpunitive."   *Id.*   When the remedy afforded by the Court "seeks to vindicate the authority of the court by punishing the contemnor and deterring future litigants' misconduct, the contempt is criminal."   *Buffington v. Baltimore County*, 913 F.2d 113, 133 (4th Cir. 1990).   Civil contempt, on the other hand, is either compensatory or coercive.   Sanctions under coercive civil contempt are designed to "coerce the

contemnor into compliance with court orders." *Bradley v. American Household Inc.*, 378 F.3d 373, 378 (4th Cir. 2004). Compensatory civil contempt sanctions, on the other hand, are designed "to compensate the complainant for losses sustained." *Id.* Provided those principles are adhered to, a contemnor can be ordered to pay the Court a fee, *id.* at 378, to compensate for the "actual loss to the complainant caused by the actions of [the contemnor]," *Schwartz v. Rent-A-Wreck America*, 261 F. Supp. 3d 607, 617 (D. Md. 2017), or be incarcerated until the contemnor corrects his actions. *See International Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 828 (1994).

Because of Defendants' actions, it is apparent that Plaintiff and his counsel had to expend resources and time litigating this issue. Plaintiff's counsel had to spend time on the contempt hearing itself, motions to receive state court records, a joinder motion, an amended complaint, and whatever other means were necessary, including preparation time, expenses, and time consulting with their client. This was all required because Defendants did not comply with this Court's preliminary injunction.

While Defendants may or may not now be in compliance, Plaintiff and his attorney must be compensated for the losses Defendants have caused. Therefore, Plaintiff's counsel is **DIRECTED** to submit a sufficiently detailed accounting of the relevant costs associated with Defendants' contempt so that the Court may enter an appropriate compensatory award. Plaintiff and his counsel may also seek compensation for his July suicide attempt.

### C. Gail Lipscomb

In addition to the Defendants' contempt, the Court must address Attorney Lipscomb's conduct.

Attorney Lipscomb filed Defendant Caruso's response brief on July 31, 2025.   In that brief, she argued that WVDHF merely appeared at the probable cause hearing to express its "security concerns" with having Plaintiff moved to Sharpe Hospital.   (*See* ECF No. 85-2 at 4.)

The same day the brief was filed, the Magistrate Judge ordered the recording of the probable cause hearing to be made part of the record and distributed it to counsel.   (*See* ECF No. 80.)   Attorney Lipscomb then listened to the recording and filed an "Errata Notice"[16] to inform the Court of "inaccuracies" in Defendant Caruso's brief.   She identified two transgressions.   The first was that WVDHF "took no position on whether probable cause should be found."   (ECF No. 87-1 at 1.)   The second was that WVDHF "only expressed an interest in protecting the current patients and staff at Sharpe Hospital" at the probable cause hearing.   (*Id.* at 1–2.)   Both of those statements were false.   Attorney Lipscomb, apparently on behalf of WVDHF, appeared at the probable cause hearing to explicitly request that Commissioner Dove deny the commitment of Plaintiff.   (*See* ECF No. 91-4 at 00:09:50.)   Both false statements offered to this Court were apparently made based on Attorney Lipscomb's "own recollection" of the probable cause hearing, and were not made to "mislead or misrepresent [*sic*] the Court with any inaccurate facts."   (*Id.*)   Attorney Lipscomb then "apologize[d] to the Court and parties."   (*Id.* at 2.)

These excuses are unacceptable.   Given everything that has happened in this case, from the probable cause hearing through the contempt hearing, Attorney Lipscomb has given the Court no reason to believe these misrepresentations were merely mistakes.   Instead, it represents a pattern for Attorney Lipscomb.   She attempts to present things in a murky light so that the tribunals she is before cannot tell what the truth really is.   She stated to this Court that she merely

---

[16]  Throughout 33 years in the law and nearly 20 years on the bench, this Court has never before seen such a filing.

represented WVDHF at the probable cause hearing when, in reality, Commissioner Dove accepted her as representing Defendant Frame. She had the opportunity to explain to the Court and the parties at the June 5, 2025, status conference what was happening with Plaintiff's commitment. Instead, she chose to blame Kafkaesque procedures as the obstacle to having Plaintiff committed. In reality, she and Defendant Frame were the obstacle. She could have been forthright in her briefs about the mistakes she made throughout this case. Instead, she chose to compound those mistakes with falsehoods, and only sought forgiveness once she was caught.

This Court is not impressed by the argument that she somehow misremembered the events of May 30, 2025. Afterall, it was on June 5, 2025, that she tried to mislead the Court as to what happened at the probable cause hearing. She knew then that she was misrepresenting a proceeding that occurred less than a week prior. She continued that deception through later briefs to the Court. (*Compare* ECF. No. 91-4 at 00:09:50 (". . . we wish to have a hearing . . . [to] challenge any involuntary commitment outside of Mount Olive."), *with* ECF No. 55 ("From the onset of this proceeding, DHF has been working diligently to secure a bed for Plaintiff at an appropriate, secure facility, pursuant to the provisions of the mental hygiene process set forth in the West Virginia Code.") (Response Brief to Plaintiff's Joinder Motion, filed June 26, 2025).)

Did Attorney Lipscomb honestly believe the truth was never going to come out? Apparently so. Only she and Defendant Frame were at the probable cause hearing. Plaintiff's counsel in the instant case and Defendant Frame's own attorney in this case were not present at that hearing. Without the recording of the probable cause hearing, the Court–and probably Plaintiff's counsel–would never have known of the violations of this Court's order and Attorney Lipscomb's duplicity.

Her actions have created chaos for everyone in this proceeding. If she were forthright about why the mental hygiene process was insufficient, Plaintiff's attorneys could have quickly responded to that. Instead, it took months to uncover the truth. Further, she enabled Defendant Frame to engage in actions that violated this Court's order when she should have counseled him on how his actions may land him in contempt. She also singlehandedly placed WVDHF in a position where it violated the Court's preliminary injunction when it was otherwise not a party to the action.

It appears that Attorney Lipscomb has failed in her duty of candor to, at a minimum, this Court. *See* W. Va. R. Pro. Conduct 3.3. Ultimately, this Court will leave it to the Lawyer Disciplinary Board to decide what to do with her conduct. Accordingly, the Court **ORDERS** that this matter be referred to the West Virginia Lawyer Disciplinary Board for a determination of what, if any, action should be taken against Gail Lipscomb.

### IV.     CONCLUSION

For the reasons stated above, the Court **FINDS** that Defendants have violated the Court's previous order. Further, Plaintiff's counsel is **DIRECTED** to file, with the Court within thirty days of entry of this Memorandum Opinion and Order, an affidavit setting forth in detail the exact amount owed by Defendants, including compensation for the suicide attempt. Upon review of the affidavit, the Court will enter a separate award order against Defendants.

The Court further **ORDERS** that Gail Lipscomb be referred to the Lawyer Disciplinary Board. The Court **DIRECTS** the Clerk to forward a copy of this order to the West Virginia State Bar.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:          August 25, 2025

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE

23